[No. D003182. Fourth Dist., Div. One. Jan. 13, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ADAM RUSSELL JEFFERS, Defendant and Appellant.

844

---

COUNSEL

Nicholas De Pento for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Frederick R. Millar, Jr., and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KREMER, P. J.—A jury convicted Adam Jeffers of two counts of pandering (Pen. Code,[1] § 266i, subd. (b)) and two counts of pimping (§ 266h). The court denied probation and committed Jeffers to the California Youth Authority. Jeffers appeals, claiming denial of his right to counsel, prosecutorial misconduct, insufficient evidence for one pandering count and the unconstitutionality of section 1203.065. We affirm the judgment.

I

PANDERING AND PIMPING AS TO BETH R.

In June 1984 driving near San Francisco with a woman named Cherita, Jeffers picked up hitchhiking 15-year-old Rhode Islander Beth R. and her 15-year-old friend Kelly A. Beth and Kelly were without money or food and needed clothing. Jeffers said he knew a way for them to make $400 a day. Beth thought Jeffers was talking about prostitution.

Jeffers paid for a hotel room for Beth, Kelly and Cherita in San Francisco. Jeffers bought shoes for Beth and Kelly. Beth, Kelly and Cherita showered, dressed and prepared to go out as prostitutes. Before leaving, they discussed prostitution with Jeffers. Jeffers said to charge $50 for intercourse. Jeffers told Cherita to tell Beth and Kelly about prostitution. Jeffers also said if the police picked them up, they should give false names and ages, claim they lost their identification, and stick to their story. The girls went over their story with Jeffers several times. Jeffers told the girls to "Go out there."

Jeffers drove the girls to a San Francisco location where they were to get "dates." Within half an hour, the vice squad stopped the girls, interrogated them, told them to go home and released them.

The girls returned to the hotel room and told Jeffers what happened. Jeffers said: "We'll stay here tonight, but in the morning we're going to go back to San Diego . . . because there's too much heat up here." Jeffers told the girls they would work in San Diego.

The next day Jeffers drove Cherita, Beth and Kelly to San Diego. Jeffers paid for food and a motel in San Diego. Jeffers gave the girls condoms and said they were to be used at all times. After Beth dressed in Cherita's clothes, Jeffers drove the girls to downtown San Diego for prostitution. Jeffers gave the girls two phone numbers, one to reach him if a problem arose or they

---

[1] All statutory references are to the Penal Code unless otherwise specified.

wanted to be picked up and the other if they were arrested. Downtown the girls looked for "dates." Beth worked five or six hours that night and performed three acts of prostitution.

Every night for a week and a half, Beth worked for Jeffers as a prostitute. Jeffers told Beth to stay in the motel room during the day. The girls drove to their work locations in Jeffers's sister's car provided by Jeffers. Jeffers recommended areas for the girls to work. Jeffers gave Beth a false birth certificate to use in obtaining an identification card from the Department of Motor Vehicles. Jeffers said he would bail out Beth if she were arrested.

Beth talked to Jeffers three or four times each night by phone about how business was going. Jeffers sometimes said the girls were doing very well. When business was poor, Jeffers told the girls to try someplace else.

Upon returning to the motel room each night, Beth left her earnings on a table for Jeffers, keeping none for herself. Cherita and Kelly also put their earnings on the table. Once Beth gave Jeffers her earnings directly. Another time Beth told Jeffers she had lost $300 or $350; Jeffers said, "Don't ever let it happen again." Beth engaged in about 40 to 50 acts of prostitution. She gave Jeffers all the money she earned.

Beth felt she would not have become a prostitute without Jeffers's help in providing a room, clothes, food, money, false identification, phone numbers and promise of bail.

Eventually police arrested Beth. She told police about Jeffers. The police said she would not be charged if she testified against Jeffers.

II

PANDERING AND PIMPING AS TO ROSEMARY T.

In early 1984 while working at a donut shop, 19-year-old Rosemary T. met Jeffers. Rosemary thought Jeffers was a pimp because the store was a hangout for pimps and Jeffers "was around there all the time." Rosemary also knew other girls worked for Jeffers. Rosemary told Jeffers she wanted to work for him. Jeffers said Rosemary could make good money. Rosemary thought Jeffers was referring to working as a prostitute. Rosemary had earlier worked as a prostitute in Los Angeles for two nights.

In June 1984 after not seeing Jeffers for some time, Rosemary phoned him and said she wanted to go. Jeffers picked up Rosemary in his car and dropped

her off on Rosecrans to work. Rosemary worked for a few hours but had no "dates."

The next night Rosemary went by bus to El Cajon Boulevard without Jeffers's knowledge and engaged in three acts of prostitution, earning $95. Rosemary unsuccessfully tried to reach Jeffers by phone that night. The next day Rosemary gave Jeffers the $95 and told him how she earned the money. Jeffers had earlier bought Rosemary a dress.

Rosemary went out another night but made no money. Rosemary phoned Jeffers and said she could not get any dates and wanted to come home. Jeffers told her to come home. The next night Rosemary went out and engaged in one act of prostitution. She used the money to pay for a room. Jeffers had paid for her room on an earlier night. Rosemary called Jeffers and asked if she could come in; Jeffers said yes.

Rosemary worked one more night, earning $30 for performing sex acts. She called Jeffers. Jeffers told her to stay out longer. She did not comply; instead she got her "stuff" and left. Later that day Jeffers saw Rosemary in a friend's car. Jeffers told her to pull over. She complied and got out of the car. Jeffers asked Rosemary why she left and where she had been all day. Rosemary told Jeffers she had been babysitting and did not want to work for him anymore. Jeffers was angry, slapped Rosemary's face and told her to get the money she made the night before and go back downtown. Jeffers said: "Nobody fucks with my pimping." Rosemary feared Jeffers. She went to Los Angeles.

About two months later Rosemary's sister received two threatening phone calls, one from a man saying Rosemary had started a job and was going to finish it. Rosemary's mother also received a call from Jeffers. Rosemary called the police about the threatening phone calls, described what happened and identified a picture of Jeffers as the person to whom she gave the money. The police led Rosemary to believe charges would be filed against her if she did not testify.

While working for Jeffers as a prostitute, Rosemary gave him her earnings or used the money to pay for her room. Jeffers knew the money was from prostitution. Rosemary felt Jeffers in return would bail her out and provide her with protection, food and clothing.

### III

On August 6, 1984, the People filed a felony complaint against Jeffers; Jeffers was arraigned in municipal court represented by retained counsel

Brian McCarthy. On August 9, 1984, at a bail review hearing with McCarthy present, the court appointed the Franklin & Robinson Defense Group to represent Jeffers. On August 10, 1984, Franklin & Robinson was confirmed as appointed counsel; Jeffers was arraigned on an amended complaint. On August 15, 1984, Pat Robinson from Franklin & Robinson represented Jeffers at a bail review hearing.

On August 29, 1984, the preliminary hearing was held with Jeffers represented by Robinson and cocounsel Michael Berg from Franklin & Robinson. Jeffers was bound over to superior court.

On September 11, 1984, the People filed an information charging Jeffers with pandering and pimping as to Beth and pandering, pimping and battery as to Rosemary. On September 12, 1984, represented by Robinson, Jeffers was arraigned in superior court.

On October 25, 1984, Robinson represented Jeffers at the readiness hearing and argued an unsuccessful motion to dismiss under section 995; trial was confirmed for November 13, 1984. Trial trailed until November 21, 1984, when Robinson appeared for Jeffers to seek a continuance. The court continued the trial until January 14, 1985.

On January 14, 1985, when the matter was called for trial, Robinson told the court she was involved as individually appointed counsel in another trial but could arrange to have another attorney from Franklin & Robinson handle Jeffers's defense. Robinson also said Jeffers wanted to hire his own counsel. The court told Jeffers: "You have a trial date set for today. If you wished to retain counsel, it should have been done weeks ago and certainly not the day of trial. I have a trial court for you." The court trailed the matter to the next day.

On January 15, 1985, Attorney Max Ruffcorn was present from Franklin & Robinson. Ruffcorn told the court he was "prepared to take this case out." Attorney Nicholas De Pento was also present. De Pento told the court Jeffers wanted Robinson to represent him but she was in trial so Jeffers asked De Pento to represent him; De Pento agreed to enter the case only if there were a continuance. The court asked Jeffers why he was dissatisfied with Franklin & Robinson. Jeffers said: "I think I would be better represented by someone who had more time to be interested in the case." Jeffers also said he would "feel a lot happier" with De Pento. The court denied Jeffers's motion to substitute counsel as not timely. The matter was sent to a trial court.

On January 16, 1985, Jeffers renewed his motion for continuance to permit De Pento to assume his defense. The People opposed Jeffers's motion

as untimely, unduly delaying and inconvenient to prosecution witnesses. The court denied Jeffers's motion. The court found "the reasons stated are not sufficient . . . [and] the motion is not timely."

## IV

At trial Beth testified for the People. The People also introduced into evidence the preliminary hearing testimony of unavailable witness Rosemary. Jeffers did not testify or present any evidence.

The jury found Jeffers guilty of pandering and pimping as to Beth and as to Rosemary. The court dismissed the battery count on the People's motion after the jury was unable to reach a decision on this charge.

The court denied Jeffers probation. In committing Jeffers to the Youth Authority, the court determined as six years the prison term to which he would have been sentenced, representing a six-year middle term for pandering as to Beth, a concurrent four-year middle term for pandering as to Rosemary and stayed six and four-year terms for pimping. (§ 654.)

## V

■  Jeffers contends the trial court prejudicially violated his rights to due process and counsel of his choice by denying his motion for continuance on the first day of trial. Jeffers asserts he showed good cause for a continuance by promptly and justifiably seeking to substitute retained counsel upon discovering his defense would be assigned to a different and inadequately prepared appointed attorney. We disagree.

■  "The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing.' " (*People* v. *Courts* (1985) 37 Cal.3d 784, 789 [210 Cal.Rptr. 193, 693 P.2d 778].) Further, "due process of law comprises a right to appear and defend with retained counsel of one's own choice." (*People* v. *Blake* (1980) 105 Cal.App.3d 619, 623 [164 Cal.Rptr. 480]; accord *People* v. *Courts, supra,* at p. 790.)

■  The trial court must " . . . 'make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney.' [Citation.] To this end, 'the state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources . . . .' [Citation.]" (*People* v. *Courts, supra,* 37 Cal.3d at p. 790.) The right to counsel of one's own choosing " . . . 'can constitutionally be forced to yield *only* when it will result in significant prejudice

to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citations.] The right to such counsel 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' [Citation.]" (*Ibid.*)

■ Generally the trial court has discretion whether to grant a continuance to permit a defendant to be represented by retained counsel. (*People v. Courts, supra,* 37 Cal.3d at p. 790.) "The right of a defendant to appear and defend with counsel of his own choice is not absolute." (*People v. Rhines* (1982) 131 Cal.App.3d 498, 506 [182 Cal.Rptr. 478]; *People v. Blake, supra,* 105 Cal.App.3d at p. 624 [164 Cal.Rptr. 480].) "A continuance may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.' [Citation.]" (*People v. Courts, supra,* 37 Cal.3d at pp. 790-791.) In deciding whether the trial court's denying a continuance was so arbitrary as to deny due process, this court "looks to the circumstances of each case, ' "particularly in the reasons presented to the trial judge at the time the request [was] denied." ' [Citations.]" (*Id.* at p. 791.)

The trial court found Jeffers's request for continuance was untimely and unsupported by sufficient reasons. ■ Jeffers has the burden to show "an abuse of judicial discretion in the denial of his request for continuance to secure new counsel." (*People v. Rhines, supra,* 131 Cal.App.3d at p. 506.) Jeffers has not met his burden.

■ Nothing in the record suggests Jeffers made a good faith, diligent effort to obtain retained counsel before the scheduled trial date. In August 1984 Franklin & Robinson as a group was appointed counsel for Jeffers. We may infer Jeffers knew his defense might be handled by anyone from Franklin & Robinson, not necessarily Pat Robinson individually. Despite such knowledge Jeffers waited until the first day of trial in January 1985 to attempt to obtain substitution of retained counsel. Jeffers made no showing he was financially unable to retain counsel earlier. On this record the court reasonably found Jeffers's motion for continuance on the day of trial was untimely.

■ Where a continuance is requested on the day of trial, the lateness of the request may be a significant factor justifying denial absent compelling circumstances to the contrary. (*People v. Courts, supra,* 37 Cal.3d at p. 792, fn. 4.) ■ Here Jeffers did not present the trial court with compelling circumstances supporting his late request for continuance. Ruffcorn told the court he was "prepared to take this case out." Jeffers made no contrary

showing Ruffcorn was unprepared or otherwise unable to provide adequate representation. Further, the fact Jeffers may have felt happier with Robinson or De Pento than with Ruffcorn was an inadequate reason for a continuance on the day of trial. Jeffers was on notice five months before trial of the possibility someone from Franklin & Robinson other than Pat Robinson might handle his defense. ■ A "[d]efendant's right to counsel does not include the right to be represented by a particular deputy public defender." (*People v. Stroble* (1951) 36 Cal.2d 615, 629 [226 P.2d 330].) ■ Similarly, Jeffers's right to appointed counsel did not include the right to be represented by a particular member of the Franklin & Robinson group. (Cf. *Drumgo v. Superior Court* (1973) 8 Cal.3d 930, 934 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984].) ■■ Although Jeffers's personal relationship with Pat Robinson was important (*Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 561 [68 Cal.Rptr. 1, 440 P.2d 65]), the Sixth Amendment does not guarantee a " 'meaningful relationship' between an accused and his counsel." (*Morris v. Slappy* (1983) 461 U.S. 1, 14 [75 L.Ed.2d 610, 621, 103 S.Ct. 1610].) Moreover, during the five months before trial Jeffers had the opportunity to substitute retained counsel if he desired, but he did not do so.

In opposing Jeffers's motion for continuance, the prosecutor expressed a valid concern about the inconvenience to witness Beth who had to travel from the east coast to testify. The trial court could reasonably find a continuance here would adversely affect the orderly administration of justice. (*People* v. *Courts, supra,* 37 Cal.3d at p. 794; *People* v. *Johnson* (1970) 5 Cal.App.3d 851, 858-859 [85 Cal.Rptr. 485].)

The trial court acted within its discretion in denying Jeffers's motion for continuance, given his request's untimeliness, its lack of legally sufficient reasons and its adverse effect on the orderly administration of justice. (*People* v. *Lau* (1986) 177 Cal.App.3d 473, 479 [223 Cal.Rptr. 48]; *People* v. *Johnson, supra,* 5 Cal.App.3d at p. 858.)

VI

■ Jeffers contends the prosecutor's comments to the jury about his failure to testify constituted prejudicial error under *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. We disagree, finding any error to be harmless.

Jeffers's counsel argued to the jury: "The judge will instruct you as to what the law is in this case. Your duty is to be a judge of the evidence. One of the instructions in the law is that Mr. Jeffers, in deciding whether or not to testify, may rely on the state of the evidence. Mr. Jeffers may rely on the failure of the prosecution to prove their case beyond a reasonable doubt

against him. No lack of testimony on the part of Mr. Jeffers will supply a failure of proof to the People. After all, he's the accused. He doesn't have to prove that he's innocent. It's a constitutional right, and you'll be instructed, for a defendant, Mr. Jeffers in this case, not to testify if he chooses. You must not draw any inference from the lack of testimony from Mr. Jeffers. You will be instructed that you must never discuss in this matter nor permit the failure of Mr. Jeffers to take the stand to enter into your deliberations in any way. You can't even talk about it.

"The production of all evidence, you'll be instructed, is not required. The only evidence that you've heard with respect to the charges against Mr. Jeffers is the testimony of Ms. [R.] and the former testimony of Ms. [T.]. That's the only evidence."

During rebuttal the prosecutor argued to the jury: "Now, he wants you to believe that Beth was up here and that she lied to you; that because she wanted to be a prostitute, that you shouldn't believe anything else she said. Let's look at that statement. She told you that she made that statement because she wanted to look bad to make the defendant look better. The defendant, after her testimony, called her, begged her not to testify, trying to persuade her not to testify. And that's what she did. But she told you what happened out there the best that she could recall, and she didn't want to add anything that she couldn't recall. She couldn't recall that he addressed to her a price. She didn't want to testify to that. But it wouldn't even matter if she did want to become a prostitute, because he continued encouraging her, helping her, assisting her throughout the time that she was out here. And that's all that's necessary for pandering. He continued to take her money, knowing it was from acts of prostitution, and that's all that's necessary for pimping. It didn't matter if she wanted to become a prostitute, even though that statement doesn't make any sense when you look at the rest of her statement, because she didn't engage in prostitution when she was coming out here. She didn't have any money. She never, never did it until the defendant brought up the idea, and she had nothing. So whether you believe that statement or not, I don't think it discredits her complete testimony, and it didn't change the fact about what the defendant did, which completes the crimes.

"Now, you see the defendant sitting there. He's been sitting here throughout these proceedings. He's young, and as an individual, you sit there and you can sympathize with what might happen to him. But that's not how you can reach your verdict. Your verdict must be reached based only on the facts.

"Now, the defense attorney has stated to you that you come in here with your common senses and not to let them go out the door when you deliberate.

But there's one thing else you can't do, and that is, you can't add to the evidence. The defendant has not testified in this case."

Jeffers immediately objected and sought a mistrial based on the prosecutor's comments about his refusal to testify. The court observed the prosecutor had not finished her sentence and later denied Jeffers's motion. The court said: "[B]asically I don't think it was a comment. I think it was a statement. A statement of fact. Something that generally you stay away from, but it was also brought up in defense's argument."

Later the court instructed the jury: "It is a constitutional right of the defendant in a criminal trial that he may not be compelled to testify. You must not draw any inference from the fact that he does not testify. Further, you must not discuss that matter nor permit it to enter, either, into your deliberations in any way.

"In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. No lack of testimony on defendant's part will supply a failure of proof by the People so as to support a finding against him on any such essential element.

"A defendant in a criminal action is presumed to be innocent until his guilt is proven, and in case of reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.

"This presumption places upon the state the burden of proving beyond a reasonable doubt. . . ."

█ Comment on a defendant's failure to testify violates the Fifth Amendment's self-incrimination clause by imposing a penalty for exercising a constitutional privilege and making assertion of the privilege costly. (*Griffin* v. *California, supra,* 380 U.S. at p. 614 [14 L.Ed.2d at pp. 109-110, 85 S.Ct. 1229].)

█ Asserting Beth's credibility was a crucial issue because of inconsistencies between her testimony at the preliminary hearing and her trial testimony as to whether Jeffers encouraged her to become a prostitute or controlled her actions, Jeffers contends the prosecutor's comments about his not testifying filled an evidentiary gap in the People's case by implying Beth's trial testimony was true because Jeffers did not testify to contradict her testimony despite the opportunity to present his side. Jeffers also contends the prosecutor's comments filled an evidentiary gap in the People's case by

implying if Jeffers did not possess the requisite mens rea and commit the wrongful acts of pimping and pandering he would have so testified. However, the prosecutor's statement about Jeffers "sitting here throughout the proceedings" was not a comment about Jeffers not testifying but rather an appeal to the jury not to be swayed by Jeffers's youth. Further, even assuming the prosecutor's later comment "defendant has not testified" was susceptible to the inferences asserted by Jeffers, any error was harmless. The prosecutor's truncated comment followed Jeffers's counsel's comment to the jury giving the proper law about the import of Jeffers not testifying. Later the court gave the jury proper instructions about the effect of Jeffers not testifying. Moreover, the People's case was without evidentiary gaps. The evidence against Jeffers was overwhelming. Lengthy detailed testimony by Beth and Rosemary directly incriminated Jeffers. Jeffers presented no defense. On this record any error in the prosecutor's comments could have had no significant impact on the jury and was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Vargas* (1973) 9 Cal.3d 470, 478, 480-481 [108 Cal.Rptr. 15, 509 P.2d 959].)

VII

Jeffers contends his conviction for pandering as to Rosemary is not supported by substantial evidence. A review of the entire record belies Jeffers's contention.

Section 266i, subdivision (b) defines as guilty of pandering a person who "by promises, threats, violence, or by any device or scheme, causes, induces, persuades or encourages another person to become a prostitute."

When Rosemary told Jeffers she wanted to work for him, Jeffers said she could make good money.[2] Rosemary called Jeffers and said she was ready to go. Jeffers drove Rosemary in his car to a spot on Rosecrans to prostitute herself. Jeffers bought Rosemary a dress. Jeffers paid for a room for Rosemary. While working as a prostitute, Rosemary called Jeffers and he told her to stay out longer. Rosemary gave Jeffers her earnings from prostitution. Rosemary felt Jeffers in return would bail her out and provide her with protection, food and clothing. When Rosemary told Jeffers she did not want to work for him any longer, Jeffers slapped her face, told her to go back downtown and said: "Nobody fucks with my pimping." Later Rosemary's sister received a threatening phone call saying Rosemary had started a job and was

---

[2]The fact Rosemary may have initially approached Jeffers because she wanted to work for him as a prostitute does not preclude a finding Jeffers pandered. (Cf. *People* v. *Bradshaw* (1973) 31 Cal.App.3d 421, 425-426 [107 Cal.Rptr. 256].)

going to finish it. The jury reasonably found from this substantial evidence Jeffers was guilty of pandering as to Rosemary.

## VIII

Section 1203.065, subdivision (a) reads: "Notwithstanding any other provision of law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, any person convicted of violating subdivision (2) of Section 261, or Section 264.1, or Section 266h, or Section 266i, or Section 266j, or 289, or of committing sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace or threat of great bodily harm or subdivision (c) of Section 311.4."

Jeffers contends section 1203.065, subdivision (a)'s absolute prohibition of probation for violating sections 266h and 266i is unconstitutionally cruel and unusual in the abstract and as applied to him. We disagree.

As a preliminary matter, we observe that the subdivision's probation ban is not the equivalent of a mandatory state prison term as Jeffers asserts. Jeffers received no such commitment nor is he subject to the minimum three-year prison term of which he complains. Rather, he was committed to the California Youth Authority and granted bail pending appeal. Barring extension,[3] Youth Authority jurisdiction over him will terminate at age 25. (Welf. & Inst. Code, § 1771.) Jeffers is now 23. In addition, controlling law permits parole whenever the Youthful Offenders Parole Board determines "it will be to [his] advantage to be paroled." (Welf. & Inst. Code, § 1176.)

Even had Jeffers been too old for a Youth Authority commitment, we would not find application of section 1203.065 constitutionally infirm.

Under the doctrine of separation of powers, courts may not lightly encroach upon matters within the Legislature's domain. (*People* v. *Wingo* (1975) 14 Cal.3d 169, 174 [121 Cal.Rptr. 97, 534 P.2d 1001].) In reviewing legislation assertedly imposing cruel and unusual punishment, the court must uphold statutes " 'unless their unconstitutionality clearly, positively, and unmistakably appears.' " (*Id.* at p. 174.)

Where reasonable minds may differ about a penalty, courts should defer to the Legislature because it has the broadest discretion possible in specifying the punishment for a crime. (*In re Lynch* (1972) 8 Cal.3d 410, 414 [105 Cal.Rptr. 217, 503 P.2d 921].) Fitting a penalty to a crime is not

[3]Extended confinement is theoretically possible under Welfare and Institutions Code sections 1780-1783 and 1800-1803.

an exact science; it involves appraising the evil to be corrected, weighing alternatives, considering policy and responding to the public will. Leeway is permissible. (*Id.* at p. 423.) The test is whether the punishment is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Id.* at p. 424.)

In *In re Lynch, supra,* 8 Cal.3d at pages 425-427, the California Supreme Court adopted a three-part analysis to determine whether a penalty is cruel and unusual: (1) evaluating the dangerousness of the offense and the offender to society; (2) comparing "the challenged penalty with the punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious"; and (3) comparing the challenged penalty with punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision.

Jeffers contends absolutely barring probation for pimps and panderers is unconstitutional because the crimes of pimping and pandering do not necessarily involve the use or threat of violence. He also attacks section 1203.065 for not distinguishing between first-time and repeat offenders. However, the Legislature has reasonably determined pimping and pandering are dangerous to society. "Pimping and pandering involve the corruption of others. The perpetrator of these offenses encourages, or profits from, the commission of crimes by others. The offenses evidence a 'readiness to do evil' [citation] and are 'extremely repugnant to accepted moral standards.' . . ." (*People* v. *Jaimez* (1986) 184 Cal.App.3d 146, 150 [228 Cal.Rptr. 852].) Sections 266h and 266i "are both designed to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes. [Citations.]" (*People* v. *Hashimoto* (1976) 54 Cal.App.3d 862, 867 [126 Cal.Rptr. 848].) Panderers commonly prey on very young women. Indeed, here Beth was a teenage runaway. Many victims of panderers have experienced difficulties at home, in school or on the job, or have become dependent on drugs, making them particularly vulnerable to panderers' promises of easy money. (Jennings, *The Victim as Criminal: A Consideration of California's Prostitution Law* (1976) 64 Cal.L.Rev. 1235, 1252.) Further, once a prostitute has an arrest record her chances of rehabilitation and finding legitimate employment are diminished. (*Id.* at p. 1247.) Additionally, commercialized sexual activity adversely affects the community by flourishing in an environment conducive to other criminal behavior. (*Id.* at pp. 1243-1244.) The Legislature may constitutionally impose a ban on probation even where a crime does not involve direct violence to another person. (*People* v. *Madden* (1979) 98 Cal.App.3d 249, 255 [159 Cal.Rptr. 381].) In light of the dangers pandering and pimping pose to both the prosti-

tute victim and the community at large, an absolute bar of probation for convicted panderers and pimps is not unreasonable.

Turning to the second prong of the *Lynch* test, comparing penalties for pimping and pandering with penalties imposed in California for other crimes deemed more serious also leads to the conclusion the Legislature did not act unreasonably in barring probation for pimps and panderers. Jeffers contends section 1203.065, subdivision (a)'s absolute prohibition of probation for pimping and pandering is disproportionate given the heinous, dangerous and violent offenses where probation is permissible in special, limited circumstances under sections 1203, subdivisions (e)(1) and (e)(2), 1203.055 and 1203.09, subdivision (f). However, the statute challenged here is not out of line with other punishments in California. The Legislature has absolutely barred probation for numerous heinous, dangerous and violent crimes more serious than pimping and pandering. (§§ 1203.06, subd. (a); 1203.065, subd. (a); 1203.066, subd. (a); 1203.075, subd. (a); 1203.09, subd. (a) and (b).) **(17)** Section 1203.06, subdivision (a)'s ban on probation for robbers using a firearm does not constitute cruel and unusual punishment. (*People* v. *Main* (1984) 152 Cal.App.3d 686 [199 Cal.Rptr. 683].) Section 1203.065, subdivision (a)'s ban on probation for rape by threat does not constitute cruel or unusual punishment. (*People* v. *Gayther* (1980) 110 Cal.App.3d 79, 90 [167 Cal.Rptr. 700].) The Legislature has also absolutely barred probation for certain controlled substances violations. (§ 1203.07, subd. (a).) Section 1203.07, subdivision (a)'s ban on probation does not constitute cruel or unusual punishment. (*People* v. *Madden, supra,* 98 Cal.App.3d 249.)

The third prong of the *Lynch* analysis is comparing the punishment imposed in California with the penalties imposed by other states for the same crimes. Jeffers contends no other state denies probation eligibility for first time violations of pimping and pandering statutes. However, Massachusetts requires two years in custody before probation eligibility. (Mass. Gen. Laws Ann., ch. 272, § 7 (West 1986).) Further, even if California's punishment may be more severe than other states' insofar as mandating three-year minimum incarceration for adult offenders, the mere fact "a majority of other states impose a less severe penalty is not enough to show cruel or unusual punishment." (*People* v. *Main, supra,* 152 Cal.App.3d at p. 696.) The *Lynch* "techniques are not mechanical—they are not conclusive or dispositive—but only grounds for suspecting the constitutionality of the statute." (*Bosco* v. *Justice Court* (1978) 77 Cal.App.3d 179, 189 [143 Cal.Rptr. 468].) *Lynch* authorizes "constitutional interference" only where the California penalty is grossly excessive compared to the rest of the nation. (*In re Maston* (1973) 33 Cal.App.3d 559, 566 [109 Cal.Rptr. 164].) California's penalties for pimping and pandering are not the nation's most severe. California's eight-year maximum punishment for the crimes is less severe

than numerous other states' maximum terms. For example, Delaware's maximum is 30 years. (Del. Code Ann., tit. 11, §§ 1353, 4205 (1984).) Twenty years is the maximum in Idaho (Idaho Code, § 18-5602 (1986)), Michigan (Mich. Comp. Laws Ann., § 750.455 (West 1986)) and Montana (Mont. Code Ann., § 45-5-603 (1986)). California's penalties are not grossly excessive or disproportionate compared to those of other states. Moreover, even if California's absolute ban of probation were deemed suspect under the third prong of *Lynch,* such punishment is not so disproportionate under the first and second prongs as to be unconstitutional. (*Bosco* v. *Justice Court, supra,* 77 Cal.App.3d at p. 189.)

Section 1203.065, subdivision (a)'s absolute ban of probation for pimps and panderers is not cruel or unusual.

Citing *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], Jeffers contends as applied to him section 1203.065, subdivision (a)'s ban of probation is unconstitutional given the relatively nonviolent facts of his crimes and his youth, intelligence, well-adjusted personality, fairly responsible behavior and minimal prior criminal record. In assessing Jeffers's contention, we are to " ... consider not only the offense in the abstract—i.e., as defined by the Legislature—but also 'the facts of the crime in question' [citation]—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*Id.* at p. 479.) We are also to consider "whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*) In *People* v. *Main, supra,* 152 Cal.App.3d 686, using the *Lynch* analysis the court held a mandatory 3-year sentence imposed on an 18-year-old robber who used a firearm was not cruel or unusual despite mitigating circumstances including the defendant's youth, unsophistication and lack of prior criminal record and the fact the gun was unloaded and inoperable.

Jeffers personally promoted, encouraged, directed, assisted and profited from his prostitutes' acts. His pandering and pimping showed sophistication, planning and premeditation. Jeffers slapped his victim Rosemary to try to force her back to work. Jeffers's victim Beth was a minor. On this record denial of probation to Jeffers with a Youth Authority commitment was not disproportionate to his crimes or his individual culpability.

DISPOSITION

The judgment is affirmed.

Lewis, J., concurred.

**WORK, J.,** —I respectfully disagree with the majority's analysis of the factual record here and the applicability of any court decision on which it relies to uphold the trial court's arbitrary refusal to permit Jeffers a meaningful opportunity to allow his *privately retained* lawyer to replace an *assigned* lawyer *whose first contact with the case was after Jeffers made his request.*

The attorney-client scenario which sets the context within which we must address this issue appears to be sui generis, at least from our review of reported decisions. In this case, the court *generally* assigned the *legal group* of Franklin & Robinson without designating any individual attorney. Apparently, the assigned legal group screens its assigned cases and matches its available lawyers according to their expertise.

The charges of pandering and pimping with which Jeffers was charged apparently fall within the class "three" category of difficulty on a scale used by the San Diego Superior Court in evaluating the degree of competence required for attorneys it assigns indigent defendants. The assigned legal group referred the case to Patricia Robinson who handled all material appearances, the preliminary hearing and the pretrial motions in superior court. On the day of trial, Robinson told the court she was presently trying a class "four" felony trial which would not terminate for another two weeks, following which she was scheduled to try another class "four" felony trial to which she had been *individually* appointed. She stated she had told Jeffers of the dilemma (presumably the same morning), and that he preferred to hire his own counsel rather than have the matter shunted-off to another appointed lawyer with no previous contact with the case. *Robinson did not ask to have the matter continued until she was available* but advised the court her legal group would locate another of its contract lawyers to appear the following day. She did not represent that this substitute lawyer would be ready to go to trial without a continuance for preparation.

The court suggested it had a problem: The trial date had arrived and if Jeffers wished to retain counsel, it should have been done weeks ago and certainly not the day of trial. (Since there is no reason to suspect Jeffers knew he was not going to have his fully prepared, competent Ms. Robinson continue to represent him until the very day of trial, the court's remarks seem singularly inappropriate.) The People represented they "*will* be calling witnesses in from out of state" and asked if the court would give an "*indication that its possible to get a courtroom this week.*" (Italics added.) The court could only reply: "It would appear that there's a possibility of a

courtroom this week, but I don't want to anticipate what's going to happen until tomorrow."

The following day, Attorney De Pento specially appeared for Jeffers, stated a financial relationship had been worked out and he was prepared to represent Jeffers if there was a continuance. Without inquiring what delay would be required, the court summarily stated: "It wouldn't appear that's going to be the case. The People are strenuously objecting."

At this point, a new representative from the Franklin & Robinson group stated he was prepared to take the case out, but could not believe a continuance would be prejudicial to the People. The court did not question the extent of preparation or readiness this lawyer had attained in the few hours since he was made aware of the case. Instead, the court asked Jeffers to explain why he was *dissatisfied* with *the legal group*. This seems an inappropriate question because dissatisfaction with the employer *entity* rather than the lawyer who is to provide actual representation, seems irrelevant. Further, the question of dissatisfaction is unrelated to a good faith reasonable request for a continuance to allow a concededly competent felony lawyer to replace newly appointed counsel.

The following day Jeffers's motion was renewed and again summarily rejected after a different judge ascertained one minor was going to have to come from the east coast. However, the People indicated *that person was merely on standby,* she was not shown to be inconvenienced by any delay, nor did the People show any inconvenience by holding her in that status. Thus, both the assignment judge and the trial judge found the motion was not timely, in spite of evidence Jeffers was unaware of the attorney-switch until the day set for trial. Timeliness therefore appears to be irrelevant under the authorities discussed hereafter. Further, the inconvenience to witnesses is not shown. The additional justification that the "reasons" Jeffers stated are not sufficient, overlooks the clear state of the record relating to a last minute loss of his experienced trial attorney in whom he had confidence, who had handled all material aspects of the case to date, replaced on the very day of trial by a person Jeffers had never met and having no familiarity with the proceedings other than perhaps looking at a bare record.[1]

The words of Justice Mosk, dissenting in *Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 936 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984], are poignantly apt: "In the foregoing factual context, how is the administration of justice served by the dogged insistence that Mr. [A] . . . and not Mr. [B]

---

[1]It is relevant also that only one prior continuance of the trial had been requested by defendant. This occurred only after the trial had "trailed" for several days, and the record is silent as to the justification for that continuance.

... represent the defendant? ... [W]hat compelling state interest is served by denying [substitution] ... of the qualified and willing attorney of defendant's choice? The obvious answer is: none."

The majority opinion in *People* v. *Courts* (1985) 37 Cal.3d 784 [210 Cal.Rptr. 193, 693 P.2d 778], relies substantially upon the premise in *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333], that chosen representation is preferred representation and that a defendant's confidence in his lawyer is vital to his defense. The facts in this case are even more compelling than those in *Courts* where the defendant was forced to go to trial without his preferred counsel, but with one who at least had been involved actively in the case for some period of time. In our case, there was a de facto substitution of counsel on the day of trial. To say due process and right to counsel of choice requires nothing more than representation by someone belonging to the same ad hoc legal group, where an indigent defendant has no choice over assignments from within that group, is absurd. We cannot equate Jeffers with the civil litigant who retains a law firm for representation. Even though civil clients justifiably may be saddled with representation by any qualified member of that firm, in practice it is seldom that civil cases are not recalendared where no substantial prejudice is shown, to allow the trial to be conducted by lawyers familiar with the case. Also, it is common to have experienced *trial specialists* in large civil firms pick up a file worked-up by staff or associates and proceed to trial. The civil client generally has bargained exactly for this. That is in contrast to what we have here where the court forced Jeffers to proceed to immediate trial with a lawyer, not shown to be a trial specialist having no preparation or prior contact with the case rather than permit him a reasonable continuance to allow his own retained counsel time to prepare, without any inquiry as to length of continuance retained counsel would need and no showing a continuance would prejudice the People or disrupt the court's calendar. Under *People* v. *Courts,* the error is reversible per se.

There are major flaws in the majority's analysis. Although it speaks of Jeffers's lack of timeliness, that is based solely on the fact his initial request was made on the date scheduled for trial. All reported decisions in which the lack of timeliness has been found to justify denial of a continuance to substitute counsel, cite one or all of the following:

(1) Defendant has had the ability but has unreasonably delayed in attempting to retain private counsel, although earlier motivated to do so;

(2) Defendant shows no potential ability to obtain private counsel within a period sufficiently short to prevent irreparable prejudice to the People's case;

(3) Defendant has secured numerous prior trial continuances because of substitutions of counsel;

(4) Defendant wants to replace competent, fully-prepared counsel who is prepared to go to trial as scheduled;

(5) Either on the date trial was to begin or occasionally after trial commenced, defendant declared a conflict of interest between himself and his attorney over trial strategy or claimed other inadequacies; and,

(6) Defendant merely expressed a personal preference for a different lawyer to be appointed at public expense. None of these factors occur here, and if they lurk undiscovered beneath the factual fabric of this case, the absolute failure of the trial court to even attempt to inquire into these relevant factors does not allow us to speculate any or all of them may exist.

Here, the majority relies on two factors, timeliness and its *speculation* about the prosecutor's concern for inconvenience to a witness having to travel from the east coast. The trial court never addressed witness inconvenience, only relying on its perception of a lack of timeliness, which as the majority stress "may be a significant factor justifying denial absent compelling circumstances to the contrary." An examination of the cases referred to in the decisional footnote[2] from which the majority extracted this principle, shows the intermediate appellate court cases mentioned therein all contain facts like those in *People* v. *Rhines* (1982) 131 Cal.App.3d 498 [182 Cal.Rptr. 478], a case to which the majority refers to support its position.

The disparity in *Rhines* and the other cases footnoted in *Courts* are exemplified by a factual resume of *Rhines*. There, the public defender had been relieved early on due to a conflict of interest and other counsel was appointed. After one trial resulted in a mistrial and seven days before a second trial was to commence, the trial court substituted new appointed counsel at defendant's request. The trial was then continued on six separate occasions by defendant's motions. On the second day of the second trial, defendant's (now third) appointed lawyer asked the court to allow Rhine to represent himself with the assistance of his present lawyer. After his concededly competent present lawyer expressed willingness to continue in his defense, Rhine asked the court to give him time to get another lawyer. There was no representation Rhine intended to or would ever be able to retain a private lawyer. *Without having his request rejected,* but with the court commenting that Rhine appeared to be deliberately attempting to create a conflict with his present counsel, he then agreed to proceed with his current

---

[2]*People* v. *Courts, supra,* 37 Cal.3d at page 792, footnote 4.

lawyer. Later that day, he elected to proceed without counsel and made a knowing and voluntary waiver of counsel. It is astounding the majority can view the facts in *Rhines* and similar cases as support for the trial court's purported exercise of discretion in Jeffers's case.

In *People* v. *Blake* (1980) 105 Cal.App.3d 619 [164 Cal.Rptr. 480], the defendant had had numerous continuances to obtain counsel before trial began and only appealed from the denial of another continuance requested *in midtrial.* In *Blake,* unlike here, there was a continuity in representation by the individual lawyer assigned to the case, and no apparent showing of ability to hire a private counsel, or representation that any particular lawyer had been selected or had agreed to represent the defendant.

More importantly, the majority overlooks the reference in *Courts'* footnote 4, to the earlier Supreme Court decision in *People* v. *Byoune* (1966) 65 Cal.2d 345 [54 Cal.Rptr. 479, 420 P.2d 221], in reference to the phrase "no compelling circumstances to the contrary." In *Byoune,* defendant was happily proceeding to trial with appointed counsel on grand theft charges, *until the very day of trial* when his motion for continuance to begin efforts to obtain retained counsel was denied as untimely. The only reason given for Byoune not attempting to secure retained counsel earlier was that he was perfectly content to proceed to trial on grand theft charges defended by appointed counsel; but when, the day before trial, the prosecution added a more serious robbery count, he reconsidered his decision. There, as in Jeffers's case, defendant promptly informed the court of his desire to obtain private counsel as soon as the posture of the judicial game-plan changed. Relying on a decision involving a similar issue in *Chandler* v. *Fretag* (1954) 348 U.S. 3 [99 L.Ed. 4, 75 S.Ct. 1], where a last minute amendment to the pleading raising the stakes made it an abuse of discretion for a court to deny a continuance to retain private counsel *even though there had been no effort made earlier to do so* and even though Byoune admitted he was still indigent and his ability to obtain funds to retain private counsel depended upon his hope he would be able to persuade a relative in Chicago to front the money, the Supreme Court rejected the People's lack of timeliness argument. The decision in *Byoune* stresses the fact the motion was made before trial commenced and the record contained no indication of any significant inconvenience to jurors or witnesses if a delay were granted.

Thus, there are really two issues here. First, whether the trial court can deny a continuance where the defendant has not shown to have been *unjustifiably dilatory* in obtaining counsel (*People* v. *Byoune, supra,* 65 Cal.2d at p. 346), and second, whether even though dilatoriness is shown, compelling circumstances exist. The expression in *People* v. *Courts* supports the second point, because the Supreme Court suggests lateness alone, if accom-

panied by the other factual circumstances present in the cited Courts of Appeal cases, would not justify denying a continuance where there are other compelling circumstances.

To the extent the majority finds support from language in *Morris* v. *Slappy* (1983) 461 U.S. 1 [75 L.Ed.2d 610, 103 S.Ct. 1610], to the effect that a "meaningful relationship" between counsel and client is not a principle guaranteed by the Sixth Amendment, each justice on the United States Supreme Court made it clear that statement is dictum. Moreover, the question of the lack of a "meaningful relationship" is a "red herring" in this case.

In *Slappy,* the only dispositive issue was whether the trial court abused its discretion in permitting substitute *assigned* counsel to proceed in face of defendant's claim of lack of preparation. Upon inquiry by the court, the substituted lawyer stated he had commenced studying the record six days before trial and had conferred with defendant during that time. The lawyer asserted, *and the court found after examination,* that the lawyer was ready, willing and able. The defendant *never requested a continuance for the purpose of obtaining privately retained counsel, or any substituted counsel before trial began*; his only claim was that present counsel had not had adequate time to prepare. That was the sole issue resolved adversely to *Slappy* and it disposed of his appeal in the United States Supreme Court. Thus, *Slappy* involved a factual dispute which was correctly resolved against the defendant's claim that his substituted assigned counsel had not been given sufficient time to prepare. Slappy *never requested a continuance for the purpose of obtaining other counsel,* although five days after trial commenced he ambiguously stated he was concerned the public defender who was originally representing him and whose inability to proceed to trial was because of illness should not have been replaced by the present public defender.

Further, the majority's reliance on language in *People* v. *Stroble* (1951) 36 Cal.2d 615 [226 P.2d 330], is misplaced. There, defendant was represented by two public defenders who were replaced by a third public defender at the insanity phase of the trial. Defendant made no objection to this substitution and only raised his complaint on appeal. *Stroble* has no factual or legal similarity to this case.

In *People* v. *Courts, supra,* 37 Cal.3d at page 794, the Supreme Court stresses the lack of any showing a continuance would significantly inconvenience the court or the People. It is obvious from the discussion in *Byoune* and in *Courts,* that the burden of producing evidence on this point is on the People. Here, the court made no finding a continuance would prejudice the People's case or the potential witnesses, and the majority speculation that

it may have been able to find support for such a finding had it inquired is immaterial to the issue raised here.

Further, that the superior court may equate the appointment of a "legal group" with the appointment of a specific lawyer in felony cases so that the same standards of timeliness should be applied when the defendant objects to being defended at the most meaningful stage of the proceedings, the trial, by an attorney *having no previous contact with the case,* makes no sense. As binding Supreme Court precedent reveals, timeliness is only a relevant factor when the defendant has no valid reason to delay the trial *to replace a prepared lawyer with whom no previous dissatisfaction has been expressed* or there is a showing the People's ability to successfully prosecute the defendant will be substantially impaired by delay. Timeliness should only be considered when the request for a continuance is whimsical, or prejudice is shown. Here the court made no inquiry as to the length of the delay and did not suggest its calendar would be disrupted to any degree let alone substantially; the People stated no valid reason to object to the continuance; and the court did not suggest a continuance to permit his present lawyer, Robinson, to continue with Jeffers's defense. The court erred in arbitrarily summarily denying Jeffers a reasonable opportunity to have his retained counsel defend him at trial.

Appellant's petition for review by the Supreme Court was denied April 2, 1987.