Filed 7/31/14  P. v. Molina CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048358 |
| v. | (Super. Ct. No. 11CF2132) |
| MICHAEL ANTHONY MOLINA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Daniel Barrett McNerney, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles Ragland and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Michael Anthony Molina of four counts of lewd conduct on a child under 14 years old (Pen. Code § 288, subd. (a))[1] and found he committed the crimes against more than one victim (§ 667.61, subd. (c)). The court found defendant had suffered a prior strike conviction (§§ 667, subds. (d), (e)(1), 1170.12 (b), (c)(1)) and a prior serious felony conviction (§ 667, subd. (a)(1)). The court sentenced him to 35 years to life in prison.

On appeal defendant contends (1) the court abused its discretion by denying his request for a continuance to permit his proffered expert witness to testify in an Evidence Code section 402 hearing, and (2) he received ineffective assistance of counsel. We disagree and affirm the judgment.

FACTS

In 2010, defendant's daughter K.J. was friends with R.C. R.C. often spent the night at K.J.'s house. She would sleep in K.J.'s bedroom or in defendant's bedroom if the girls fell asleep while watching his television. When the girls would fall asleep in defendant's room, he would join them in his king bed. This happened around five times. Defendant's wife slept in a different room.

On December 31, 2010, R.C. spent the night with K.J. R.C. had just turned 11 years old. As R.C. lay asleep in defendant's bed between defendant and K.J., defendant rolled on top of her. His erect penis rested on her thigh, his chest was atop hers, and he moved his hips back and forth. Defendant whispered to R.C. that she was pretty. He asked her if she liked it, said he was trying to make her feel more relaxed, and rubbed her arms.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

2

R.C. moved over and pushed him away. She woke up K.J. The girls went in the bathroom. R.C. told K.J. what had happened. R.C. felt scared and sad.

They decided to tell K.J.'s mother. They went to the living room and woke up K.J.'s mother and told her what defendant had done. K.J.'s mother did not believe R.C. K.J.'s mother became upset, called R.C. a liar, and told R.C. to go home. K.J.'s mother said R.C. was "trying to get [defendant] for [herself]." R.C. replied "that would just be gross and weird."[2]

About a month later, R.C. and K.J. were in K.J.'s bedroom. Defendant came in wearing only pink underwear. He asked the girls to call him "Michelle." They went to defendant's bedroom to watch television. They were under the blankets. When K.J. left the room, defendant moved closer to R.C. and put his leg over her thigh. He started moving his hips in a humping motion on her legs. R.C. shoved defendant and went to look for K.J. R.C. tried to tell her mother about defendant's actions, but R.C.'s mother did not believe her and said defendant would not do that because he was a good man.

On August 1, 2011, while defendant, R.C., and K.J. were in defendant's bedroom, defendant took off his shorts. Underneath, he wore pink women's underwear. R.C. and K.J. hid under a blanket at the foot of the bed. Defendant lay under a different blanket. He tapped R.C. and pulled her over to one side so she was not under the blanket anymore. R.C. saw defendant move his hand over his private part while grunting and whispering R.C.'s name. At some point, defendant stopped masturbating. R.C. saw that his shorts were wet. R.C. and K.J. laughed because they thought defendant had urinated in his pants. Defendant told them it was not funny.

---

[2] In a subsequent police interview, K.J. said she mentioned the incident to her mother again when they were alone driving to Big Saver. K.J.'s mother said R.C. was flirtatious and was trying to get attention.

3

R.C. and K.J. decided to catch defendant on film so they could prove they were not lying. They told defendant they wanted to see what sperm looked like. They suggested a sperm experiment where defendant would put his sperm into a water bottle. Defendant was okay with the idea. He said he would get the sperm into the water bottle by making himself feel good.

On August 2, 2011, defendant mentioned the sperm experiment. R.C. and K.J. decided it was a good day to video record him. K.J. used her iPod Touch to take videos of defendant. She stopped and started the video record whenever defendant would come in the room.

Defendant said he was going to make himself feel good using R.C.'s body. One of K.J.'s videos showed defendant's erect penis. Defendant rubbed R.C.'s legs. He said they were going to do something later, when it was darker, and that he was "going to rub [R.C.] here or here on [her] body."

Sometime that month, R.C.'s older sister had a phone conversation with R.C. R.C. was 12 years old then and asked her sister what sex was. R.C. said she thought she had had sex. She believed "sex was humping with clothes on." R.C.'s sister told her parents about the conversation and expressed her concern that R.C. should not spend the night at defendant's house anymore.

On August 7, 2011, during a game of "Truth or Dare," K.J. and R.C. asked R.C.'s sister and the sister's friend what sex was. K.C. then showed R.C.'s sister and the sister's friend five iPod videos of R.C. and defendant. R.C.'s sister showed the videos to her aunt and to her grandmother, who called the police. When the police arrived, defendant came out of his house, yelling that R.C. was a liar, even though he had not yet talked with the police and had only seen the police cars.

4

Two officers interviewed defendant at his home on August 7, 2011. Defendant yelled at the officers that he could not believe he would be accused of such a thing. He denied ever touching the girls inappropriately, and stated that the only contact he had with the girls was wrestling in bed and painting his nails because he likes to "cross-dress." He said R.C. came into his bedroom once without knocking and saw him in his underwear, and that is when he knew R.C. was "trouble." When asked whether he had ever massaged R.C., defendant initially stated never, then stated that he had done so, but only her back. Defendant said he had been hit in the head with a baseball and that the injury affected his memory. After an officer asked defendant if the girls had ever recorded him, defendant replied that now that the officer mentioned it, he did remember that on one occasion he had massaged a little bit of the girls' legs. He also remembered telling the girls not to record him because it could get him in trouble. Defendant then denied massaging the girls and said he placed the girls on his legs because they wanted to paint his nails. Defendant told the police that his story kept changing due to his head injury and resulting memory problems.

An officer interviewed K.J., who was nervous, scared, and extremely upset. K.J. said the problem started on New Year's Eve of 2010. K.J. said she was scared of her father because he used prescription pills, marijuana, and alcohol, and because of his violent behavior and tendency to touch her and R.C. She said defendant told R.C. and her that he was a massage therapist. He would massage the inside of K.J.'s thighs, but did not touch her so often because she would kick, scream, and fight him off by flailing her arms and legs. Defendant would also follow her into her bedroom after she had showered. At first, K.J. had a lock on her bedroom door, but defendant removed the lock. After that, whenever K.J. returned to her room from showering, she would barricade her door with chairs and other items to try to keep defendant out, but it did not stop him. He would come in, see her undressed, and say, "Oops." K.J. would kick and push him out of her room. K.J. explained that defendant liked R.C. and would touch K.J. more when R.C.

5

was visiting. K.J. said she (K.J.) was a heavy sleeper so sometimes she would not wake up, but had been told by R.C. what had happened. She described the incident when defendant was dressed in panties and small dolphin shorts, rubbed his penis, called out R.C.'s name, and told the girls to move the covers (under which they were hiding) so they could watch him. Defendant told the girls it would be easier for him to masturbate if the girls were watching.

At trial, K.J. denied that anything inappropriate had happened between defendant and R.C., and recanted many of her previous statements to police. She testified defendant had cross-dressed for a couple of months after he got out of "rehab for alcohol and drugs." This was after he got hit on the corner of his eye with a baseball. Defendant would act like a girl and refer to himself as Michelle.

DISCUSSION

*The Court Did Not Err by Denying Defendant's Request for a Continuance*

Every defendant has a constitutional right to present a complete defense. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) Defendant claims the court violated this right when it denied his motion for a midtrial continuance to accommodate the schedule of his proffered expert witness, Dr. Charles Hinkin. Defendant contends Hinkin's testimony would have revealed a "traumatic brain injury" in defendant's past that left him "impulsive and disinhibited" and compromised his decision-making ability.

Prior to trial, defense counsel submitted to the court a letter and 28-page report from Hinkin outlining his expert opinion. The People moved to exclude Hinkin's testimony as improper and irrelevant. Defense counsel indicated he had yet to decide whether Hinkin would take the stand at all and, therefore, defense counsel preferred to address the issue after the People rested their case-in-chief. The matter was therefore tabled.

6

On February 28, 2013, the People ended their presentation of evidence, and defense counsel reminded the court of the outstanding question about the admissibility of Hinkin's testimony. On Monday, March 4, defense counsel informed the court that Hinkin was unavailable to testify in an Evidence Code section 402 hearing until the following morning, Tuesday, March 5.

After reviewing Hinkin's letter and report, the court denied defendant's continuance motion. The court found insufficient justification to delay the case for an additional day because the proffered testimony lacked sufficient probative value on any relevant issue. The court stated Hinkin's letter and report showed defendant "has impulse control issues and makes poor decisions," but this evidence was cumulative, as well as irrelevant because it did not suggest "that his mental function in any way impairs his ability . . . to interact with [the children] in a way motivated by sexual desire."

Section 1050, subdivision (a) requires criminal cases be heard and determined "at the earliest possible time." To further this goal, a trial court can grant a continuance *only* upon a showing of "good cause." (*Id*., subd. (e).) Whether a midtrial continuance is granted for good cause "'"rests within the sound discretion of the trial judge . . . ."'" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1105; see *People v. Jeffers* (1987) 188 Cal.App.3d 840, 850 [untimeliness of continuance request may be significant factor justifying denial].) "To establish good cause for a continuance, [a] defendant [bears] the burden of showing that he had exercised due diligence to secure the witness's attendance, *that the witness's expected testimony was material* and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven." (*People v. Howard* (1992) 1 Cal.4th 1132, 1171, italics added.)

7

In order for evidence of mental defect, disorder, or disease to constitute material evidence it must be evidence having a tendency in reason to prove or disprove whether a defendant had the requisite intent for a crime.  (§ 28, subd. (a); Evid. Code § 210).  "Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent . . . when a specific intent crime is charged."  (*Ibid.*)  Over three decades ago, "when our Legislature eliminated the defense of diminished capacity [citation], it precluded jury consideration of mental disease, defect, or disorder as evidence of a defendant's *capacity* to form a requisite criminal intent, but it did not preclude jury consideration of mental condition in deciding whether a defendant *actually* formed the requisite criminal intent."  (*People v. Williams* (1997) 16 Cal.4th 635, 677.)  Section 29.2, subdivision (b), further explains:  "[E]vidence that the accused *lacked the capacity or ability to control his or her conduct* for any reason shall not be admissible on the issue of whether the accused actually had any mental state . . . ."  (Italics added.)  These evidentiary rules do not abridge an accused's right to present a defense.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 999 [state evidentiary rules generally do not violate the right to present a complete defense].)

A "court's denial of a motion for continuance is reviewed for abuse of discretion."  (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037).  "'Discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered.'"  (*People v. Froehlig* (1991) 1 Cal.App.4th 260, 265.)  "'In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, "'particularly in the reasons presented to the trial judge at the time the request [was] denied.'"'"  (*Ibid.*)  The appellant bears the burden of showing an abuse of discretion.  (*People v. Jeffers*, *supra*, 188 Cal.App.3d at p. 850.)

8

Here, the trial court did not abuse its discretion nor violate defendant's right to present a defense when it denied his continuance motion because Hinkin's proffered testimony was immaterial to the charges brought against defendant. Hinkin revealed, through his expert report and letter to counsel, the evidence he had to offer showed defendant could not control his impulses or decision making. Hinkin suggested the injury defendant suffered "*exacerbated his pre-existing psychiatric illness and caused him to become more impulsive and disinhibited, worsened his decision-making ability, and led to an increase in cross-dressing behaviors*." On appeal defendant does not refute defense counsel intended to call Hinkin for this very testimony, "that the traumatic brain injury affected [defendant's] ability to control his impulsiveness." This is exactly the type of testimony expressly forbidden by section 29.2: evidence of a defendant's ability to control his or her actions. Applying the rationale in *People v. Williams*, *supra*, 16 Cal.4th 635, it is not material *why* defendant formed the intent to sexually abuse the two victims, only whether such intent was ever actually formed. As the court in *People v. Cunningham*, *supra*, 25 Cal.4th 926 illustrated, this state rule regarding relevance does not interfere with defendant's constitutional right to put forth a full defense.

Defendant argues now that the testimony could have supported a jury instruction "pursuant to CALCRIM No. 3428 to consider defendant's mental defect in deciding whether he *acted* with the requisite lewd intent to commit the charged offenses." Defendant also relies on *People v. Larsen* (2012) 205 Cal.App.4th 810, 828, which held that evidence of mental illness was relevant to whether the defendant actually formed a mental state that was an element of the charged offense. To the issue here, both CALCRIM No. 3428 and *Larsen* are inapposite. As explained above, Hinkin's opinion did not go to the *existence* of intent. Indeed, as the Attorney General argues, "[Defendant's] inability to control his impulses and conduct says nothing of whether, when acting on those impulses, he did so with a sexual intent. In fact, Dr. Hinkin's report

9

suggests [defendant's] traumatic brain injury diminished his inhibitions which meant he acted more readily on his sexual desires."

Because Hinkin's testimony was to be offered for inadmissible purposes, the court did not abuse its discretion in deciding not to grant a continuance to secure his presence.

*Defendant Fails to Demonstrate He Received Ineffective Assistance of Counsel*

Defendant claims his trial counsel provided him with ineffective assistance by failing to ensure, before the People rested their case-in-chief, that Hinkin would be available to testify.

In order for an appellant to successfully prove an ineffective assistance of counsel claim, he or she must show (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) It is not necessary to "address both components of the inquiry if the defendant makes an insufficient showing on one." (*Id.* at 697).

To prove prejudice to the defense, an appellant must prove there exists a reasonable probability the case would have resulted in a more favorable outcome to the appellant, not merely some "conceivable effect" on the case's outcome. (*Strickland*, *supra*, 466 U.S. at p. 693).

Defendant's claim fails to pass muster under the second prong of the *Strickland* analysis. The testimony sought from Hinkin was inadmissible testimony regardless. Allowing a continuance to ensure Hinkin arrived for an Evidence Code section 402 hearing only to rule his testimony inadmissible is not a result that makes it reasonably probable the trial's outcome would have been more favorable to defendant.

Without a showing of prejudice to the defense, defendant's claim of ineffective assistance of counsel must fail.

10

DISPOSITION


The judgment is affirmed.



IKOLA, J.

WE CONCUR:


FYBEL, ACTING P. J.


THOMPSON, J.