Filed 12/19/14  P. v. Franklin CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C069903 |
| Plaintiff and Respondent, | (Super. Ct. No. SF109284A) |
| v. | |
| ALOYSIUS PATRICK FRANKLIN, | |
| Defendant and Appellant. | |

Defendant Aloysius Patrick Franklin was found guilty by a jury of second degree robbery.  (Pen. Code, § 211.[1])  The jury also found true an allegation that defendant personally used of a shotgun.  (§ 12022.53, subd. (b).)  Additionally, the trial court found true allegations of a prior strike conviction (§§ 667, subd. (d), 1170.12, subd. (b)) and three prior prison commitments (§ 667.5 subd. (b)).  The court sentenced defendant to 19 years in state prison.

---

[1]  Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

Defendant contends the trial court abused its discretion by denying defendant's request for a continuance made on the second day of trial to substitute privately retained counsel for his court-appointed counsel. We conclude the trial court did not abuse its discretion. Defendant also contends a $380 administrative fee for restitution fund collection -- which the court clerk added to the minutes and abstract of judgment -- must be stricken because the trial court did not orally pronounce the fee, and the oral pronouncement of judgment controls.

We conclude the fee is mandatory and modify the judgment, as orally pronounced, to include the mandatory fee and direct that the abstract of judgment be amended to reflect the statutory basis for the fee. We otherwise affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In September and October 2008, the prosecution filed informations charging defendant with robberies occurring on different dates.[2] In case number SF109238, defendant was charged with one count of second degree robbery of one victim at a Metro PCS store on August 13, 2008, with allegations against defendant for personal use of a firearm and three prior prison terms. In case number SF109284, defendant was charged with four counts of second degree robbery of four victims at Visual Image Salon on August 2, 2008, with allegations against defendant for personal use of a firearm, three prior prison terms, and a strike allegation. The trial court later granted the prosecutor's request to consolidate the two cases for trial under case number SF109284A.

---

[2] In both cases, defendant was charged with a codefendant who is not a party to this appeal.

2

**Section 1368, *Marsden*, and other Pretrial Proceedings**

On June 11, 2009, Judge Franklin Stephenson suspended criminal proceedings, at the request of defendant's appointed counsel, for an evaluation of defendant's mental competence pursuant to section 1368.[3]

On July 7, 2009, appointed counsel advised Judge Richard Vlavianos that she had mental health records indicating that a section 1370 evaluation would be appropriate. The prosecutor agreed and "VMRC" was appointed.[4]

As of July 28, 2009, two doctors had opined defendant was competent, but the report from VMRC was still outstanding. Appointed counsel said she had school records indicating defendant had a fairly low IQ. Counsel also stated that she had been having "some difficulties" with defendant. Thinking it may be some time before the VMRC report was ready, Judge Vlavianos appointed a doctor to perform the section 1370 evaluation.

In August 2009, Judge Vlavianos received the third doctor's section 1370 report. This doctor opined that defendant was *not* competent. The trial court continued the matter for a report from VMRC regarding competency training to restore defendant to competence.

In September 2009, Judge Vlavianos stated that the court had received a letter from a VMRC psychologist indicating defendant did not cooperate. VMRC had previously evaluated defendant in 1987 and determined he was not developmentally disabled so as to qualify for its services.

---

[3] Defendant contends his cognitive abilities affected his ability to diligently seek private counsel. However, after a period of observation, doctors at Napa State Hospital later determined defendant was malingering and the trial court cited that as evidence defendant was "trying to fool" the court. Accordingly, we discuss the procedural history of the section 1368 proceedings in some detail.

[4] VMRC refers to Valley Mountain Regional Center.

In October 2009, defendant was released on bail.

Trial was set for November 2009, but the case was continued several times at the request of defense counsel, who said she wanted to pursue an appeal with VMRC but kept having trouble connecting with them and had another trial coming up.

In July 2010, defendant appeared for a trial readiness conference before Judge Vlavianos with a different deputy public defender, who requested a continuance to ask VMRC to perform a competency evaluation. The court acknowledged the requirement that a doctor from a regional center evaluate a person who is suspected to be developmentally disabled and pointed out the VMRC had tried to perform an evaluation, but defendant refused to cooperate. Defense counsel said she wanted to try again. Additionally, counsel contended that updated evaluations were in order "because it's been so long since anybody has interviewed [defendant]" and she had been unable to "communicate effectively" with defendant. Judge Vlavianos ordered new evaluations, appointing three doctors, including one from the regional center. Judge Vlavianos told defendant that if he did not make the required appointments with the doctors, the court would place defendant in custody in order to get the interviews done. The court reset the trial date to August 22, 2010, and set a new trial readiness conference for August 19, 2010.

On August 19, 2010, defendant was in custody[5] and had been seen by the doctors, but the court had not yet received the reports; therefore, the matter was continued.

At the next court appearance on August 31, 2010, defendant appeared "out of custody," and the trial court granted the prosecutor's request for a one-week continuance to review the doctors' reports and compare them to the previous reports.

---

[5] The record is not clear why defendant was in custody.

4

On September 9, 2010, the parties submitted the competency question on the reports of two doctors. Based on the reports, Judge Vlavianos found defendant incompetent and ordered him committed to the State Department of Mental Health at Napa for care, treatment, and competency training. The court did not remand defendant into custody because he had said he wanted to be present at the birth of his child.

At the next court hearing on September 30, 2010, defendant failed to appear. He was a fugitive until February 22, 2011, when he appeared in court, in custody.

On March 1, 2011, the CONREP Community Program Director questioned whether defendant was incompetent since he had been able to live in the community and was balking at taking medications, questioning what medications he would be required to take. Judge Vlavianos ordered an updated mental evaluation and appointed one of the two doctors who last opined defendant was not competent.

On March 22, 2011, the parties submitted on the report finding that defendant was incompetent and the court remanded defendant to Napa State Hospital.

On July 19, 2011, defense counsel was granted continuance to August 2, 2011, to review a report from Napa State Hospital, and defendant was released on bail.

On August 2, 2011, the parties submitted on the report from Napa, which indicated defendant was competent to stand trial, and Judge Vlavianos found defendant had been restored to competency under section 1372. The court reinstated criminal proceedings.

On August 22, 2011, defendant pleaded not guilty and not guilty by reason of insanity (NGI) under section 1026. Two doctors were appointed to evaluate defendant's sanity at the time of the crime.

On September 13, 2011, the prosecution filed an amended information against defendant, adding an allegation that defendant served a prior prison term for a violent felony (§ 667.5, subd. (a)), and an additional strike allegation (§§ 667, subd (d), 1170.12, subd. (b)).

5

During the September 26, 2011, trial readiness setting, defendant requested new appointed counsel. The case was sent to Judge Michael Garrigan, who held a hearing in camera under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). Defendant claimed that he had only seen his lawyer twice in two years, and that he thought she should file motions under sections 995 and 1538.5, but she had not done so. Appointed counsel informed the court that she thought there were no grounds for the motions defendant wanted her to file, and she felt a section 995 motion would be denied because there had been live witnesses at the preliminary hearing. Counsel stated she was ready for trial, had attempted to discuss the case with defendant, and had spoken to the previous appointed counsel about the case "numerous times." Defendant complained both that his lawyer was trying to get him to accept a plea deal and that his lawyer had not spoken to the prosecutor about a plea deal on his behalf. Counsel said defendant had always wanted to proceed to trial. She nevertheless continued to negotiate a plea agreement but she did not know if defendant wanted one. "He's always wavering. I don't know if he wants to resolve the case and, if so, what number is he looking at, or does he just wanna [*sic*] proceed to trial, which I'm prepared to do which is fine." Defendant said he "pretty much" had his "mind made up" and did not want this lawyer and thought she did not have his best interests in mind. The trial court denied the *Marsden* motion.

On October 3, 2011, defendant withdrew his NGI plea. Appointed counsel said she was in trial on another case, but she requested that defendant's case not be time waived, and trial was set for October 11th.

On October 11, 2011, the trial court granted the prosecution a short continuance. The matter was transferred to another courtroom for another *Marsden* motion. Before the hearing, defendant withdrew the motion.

On October 17, 2011, the case was sent to Judge Terrence Van Oss for trial, and the parties argued motions in limine. The prosecutor dismissed the second alleged strike

6

and defendant entered a plea of not guilty on the amended information. In defendant's presence, the trial court ordered 75 prospective jurors for the following day.

### Second Day of Trial *Marsden* Motion and
### Request for Continuance to Hire Private Counsel

On October 18th, just before jury selection and as everyone waited for the prospective jurors to be sent to the courtroom, the trial court noted defendant "made some comments here that sounded like he wanted to raise a Marsden issue." The court held an in camera hearing and asked what defendant wanted to say, which led to the following:

"THE DEFENDANT: I don't know what's going on. Like this is not right. Like, I feel I need to talk to somebody. And this person right here is definitely not for me right here.

"THE COURT: Well, this is the time for you to talk to someone. You can talk to me. What would you like to say?

"THE DEFENDANT: That something is wrong. I need to talk to somebody.

"THE COURT: Tell me. What is it you want to say?

"THE DEFENDANT: Like, I don't know what's going on.

"THE COURT: You don't know why you are here?

"THE DEFENDANT: Yeah. I don't know what's going on, period.

"THE COURT: Okay. Well, today we are scheduled for a jury trial to determine whether you are guilty or not of these offenses that were charged against you.

"THE DEFENDANT: When?

"THE COURT: Today.

"THE DEFENDANT: Something today happened?

"THE COURT: Yeah. We are waiting for a jury to come upstairs to hear this case.

"THE DEFENDANT: About what? That's what I'm saying, I don't know about what. Like, I haven't done nothing.

7

"THE COURT: Okay. Are you suggesting you have amnesia?

"THE DEFENDANT: I don't know what's supposed to happen or what's going on right now.

"THE COURT: Okay. Well, okay. The Court will -- first of all, observe that apparently this is not a Marsden issue. Mr. Franklin is expressing his ignorance and confusion here about the proceedings which apparently has been consistent throughout the history of this case.…"

The trial court summarized the procedural history of the case, and discussed the Napa State Hospital report of June 21, 2011: "[T]he report was essentially that Mr. Franklin here was able to cooperate but just declined to do so and basically is malingering. [¶] The report went on to say that 'it is opined that Mr. Franklin has the ability to understand the competence material and rationally cooperate with his attorney given the following observable behaviors: Clear and direct advocacy for telephone usage; tracking telephone calls including length and quantity and then staff are also monitoring the unit pay phone as well[;] [f]ollowing unit rules and hospital policies; adhering to the unit's schedule; requesting information about his account; recalling times of television shows and choosing not to attend certain core groups; moreover, upon his admission to Napa State Hospital, Mr. Franklin was administered the structured interview of reported Rey R-E-Y, 15 Memorization test.… The manner in which Mr. Franklin approached these tests appears to provide evidence that Mr. Franklin is feigning symptoms of mental illness.' [¶] And then they went on to conclude that he therefore did possess the capacity to be competent but just didn't want to do it. [¶] And the Court will note that throughout the interview with Mr. Franklin, back in June, he was continuing to say exactly the same things he's saying now he doesn't know what's going on. He doesn't know who is attorney is. He doesn't know anything about the whole situation. [¶] So it appears that his statements were all basically the same in June as they are now. And the Court as of August, reviewed all that, considered all that and found him…

8

competent to stand trial.… [¶]…[¶] [B]ased upon the history I just recited, I would not find there is any doubt about his ability to rationally cooperate with his attorney and to understand the nature and proceedings of the trial here in view of the previous findings of the doctors and the repetition of the history here.…"

Defendant continued to claim that he did not know what was going on and said his appointed counsel was "trying to hurt me, too." The court asked how defendant had known that if he did not know what was going on. Defendant replied, "From what she is telling me." When asked how counsel was trying to hurt him, defendant said, "She know what [she] be doing."

The trial court stated for the record that it did not consider this a *Marsden* matter, but if it were, there was no showing that appointed counsel lacked competence or that defendant could not get along with her if he chose to do so. He was just choosing not to do so.

Proving the trial court's point that defendant did indeed understand what was going on, defendant interjected, "At times she never brought nothing for me, no type of tape or video for me to see in over three years. You tell me to take 14 years, and definitely not for me. Trying to tell me you want to help the D.A. get 50 years."

The court ended the in camera hearing. Back in open court, the court noted they were still waiting for the prospective jurors to be sent up and called a recess, indicating they would resume when the jurors arrived. Defendant then asked, "So you are not going to let me fire her?" The court said no, because "it's too late" and "you haven't told me anything that would justify me relieving her." Defendant said, "You wasn't [*sic*] listening to me right now." The court said it would give defendant another chance and conducted another in camera hearing.

Defendant complained that his appointed counsel had not tried to file a suppression motion, which defendant knew because "I tried to ask her about it." Defendant went on, "I never seen this so-called tape or video you [are] all talking

9

about.[6] It's been over three years. I have never seen it. Asked about it, asked about it. She wave[d] me off." Counsel said she took the DVD to the jail to show defendant, but could not get it to work, so she had told him what was on it and planned to show it to him during a court recess. Defendant also referred to the "suppression motion I was talking about was to the time of the eyewitness identification subject to attack on the basis of credibility of evidence of whether the criminal was masked or disguised, and I want to make a motion to suppress that" because "certain things, I guess, in the report said that whoever the black person was supposed to have covered up his face or something and had glasses on. So I'm saying before a person only be able to see that much, it looks like something to suppress." The court asked why defendant wanted to suppress it, and he said he had to fight for himself because his counsel was not going to fight for him. Defendant added that counsel "tried to tell me she's not going to file a Romero if I'm found guilty and she going to help the D.A. play his cards right so he can give me 52 years, but this is supposed to be something [sic] representing me. It don't sound like you are for me if you helping the D.A. give me 52 years, you know…." Counsel said she had told defendant about the prosecutor's offer of a plea deal for 14 years. Defendant denied she had informed him that it was 14 years and that she instead had told him that it was five years; therefore, he did not take the plea deal.[7] When the court asked him why he had not taken the five-year offer, defendant responded, "Why would I do that?"

The trial court pointed out that defendant had just claimed not to know what was going on and "[n]ow, when you want to get rid of her, you are giving me all this specific information showing me that, in fact, you do know exactly what this case is about. You

---

[6] There had been discussion during the in limine motions the previous day about the video.

[7] As noted, during the first in camera hearing that day, defendant said, "You tell me to take 14 years, and definitely not for me."

10

know what the evidence is, you know what you should be seeing, and what you shouldn't be seeing. You are giving me detailed information. So you are contradicting yourself in those two things. That's why I don't think you are a 1368, mentally incompetent." The court then told defendant it felt defendant was "trying to fool" the court and added that defendant had not even come close to showing grounds to relieve appointed counsel. The court stated, "we have a jury coming up here in a few minutes and they will decide what happened" and defendant could talk to counsel while they waited.

Defendant then asked, "What if I want to try and hire an attorney? Because I'm not going nowhere with her." The court stated it was denying the *Marsden* motion without responding to defendant's question.

Back in open court, defendant made a request: "*After talking to my sister right now*, I want to try and hire counsel. So I would like to try to waive time because [my sister] wants to try and hire me an attorney, because I let her know the conflict and things going on between her and, you know, *trying to get the rest of the money together*." (Italics added.) When the court asked the prosecutor about a continuance, the prosecutor initially asked to make a phone call, because he was having issues with police witnesses; but then, without making the call, said he did not think things would be any better in the future because of the upcoming holidays, and so he opposed a continuance.

The trial court noted this case was three years old and told defendant: "[I]t's too late now to try to change attorneys. If you had wanted to do this before, Mr. Franklin, you [would] have been welcome to do so. But it's too late now. No attorney that you would hire today would be ready to proceed with this trial for at least a month, if not more. So it would be delayed again. And there is no guarantee that you would be able to do that anyway. Attorneys are very expensive.… [I]f you wanted to do this earlier, you certainly could have but it is too late now."

In response to the trial court's point that defendant had three years to retain counsel, defendant pointed out that his current attorney had not been on his case the

11

whole time; that he previously had different appointed counsel. The court noted defendant had been out of custody for part of the time, that he had to be extradited from another state to get him back into court, that he was apparently out on his own at some point in time and that he should have hired a lawyer then if he wanted one, and that "[i]t's too late to do it."

The case proceeded to trial.

### Trial Evidence

The four victims of a robbery at a Visual Image hair salon were unable to identify defendant as one of the masked robbers at trial, and there was no circumstantial evidence of defendant's involvement. Accordingly, the trial court granted a defense motion to dismiss Counts 1, 2, 3, and 4 pursuant to section 1118.1.[8]

As to the second robbery, an employee of the Metro PCS store testified she was working alone on August 13, 2008, around 3:15 p.m., and became nervous when a red or maroon car drove past the store repeatedly, with the occupants looking into the store. She called 911. She tried to leave the store but defendant and another male walked in with guns. Defendant pointed his gun at the employee. At their command, the employee helped them open the safe. Defendant grabbed cell phones from the safe and put them in a duffel bag. The employee escaped to the bathroom and locked herself inside. She peeked out of the bathroom door and saw one of the men running out the door and a police car pulling into the parking lot. She returned to the sales area and saw the cash register had been opened and that the cash was missing.

The police officer observed a maroon car with a driver and one passenger. The officer later identified defendant as the driver. The maroon car drove deeper into the

---

[8] On the previous day, the trial court excluded portions of a conversation between defendant and the codefendant recorded by the police which, according to the prosecution, were about the salon robbery.

parking lot and took a long time to reappear.  When the car reappeared, the passenger was gone.  The officer made a traffic stop, heard a radio report that the Metro PCS had been robbed, and arrested defendant.  The officer found a "wad" of crumpled cash -- $204 -- in defendant's right front pants pocket and no money in the wallet defendant had in his left rear pants pocket.  A shortened shotgun was later found in the parking lot in front of the store.

## Verdicts and Sentencing

The jury found defendant guilty of the Metro PCS robbery and found true the firearm allegation.

In a court trial of the prior conviction allegations, the trial court found true the prior strike allegation and three prior prison terms.  The court found not true the section 667.5, subdivision (a), allegation because that prior assault was not considered a violent felony since it did not have a firearm enhancement.[9]

The trial court sentenced defendant to 19 years in state prison, calculated as follows:  three years (the midterm) for the robbery charged in Count 5, doubled for his strike prior (§§ 667, subd. (d), 1170.12, subd. (b)), plus ten years for the firearm enhancement (§ 12022.53, subd. (b)), plus one year for each of the three prior prison terms, to run consecutively.

The trial court orally imposed a $3,800 restitution fine and imposed, but stayed a parole revocation restitution fine.  (§§ 1202.4, subd. (b), 1202.45.)  Though not orally pronounced by the trial court, the clerk's minutes and abstract of judgment show a $380 fee as a restitution fund collection fee, presumably under section 1202.4, subdivision (*l*).

---

[9] As noted by the People, the clerk's minutes do not reflect the "not true" finding.

13

## DISCUSSION

## I. Denial of Continuance

Defendant contends the trial court abused its discretion by denying his request for a continuance so he could retain private counsel to substitute for his court-appointed counsel. We disagree.

Section 1050, subdivision (e), provides that "[c]ontinuances shall be granted only upon a showing of good cause. Neither the convenience of the parties nor a stipulation of the parties is in and of itself good cause." The trial court has broad discretion to determine whether good cause exists. (§ 1050, subd. (e); *People v. Alexander* (2010) 49 Cal.4th 846, 934-936.) On appeal, we review the denial of a continuance for abuse of discretion. (*Ibid.*) This standard applies to requests for time to allow a defendant to retain different counsel. (*People v. Jeffers* (1987) 188 Cal.App.3d 840, 849 [denial of day-of-trial request for continuance for trial preparation by newly retained counsel who substituted in that day was not an abuse of discretion].)

The constitutional rights of due process and effective assistance of counsel encompass a right to defend with privately retained counsel of one's own choice. (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144 [165 L.Ed.2d 409]; *People v. Courts* (1985) 37 Cal.3d 784, 789 (*Courts*); *People v. Crovedi* (1966) 65 Cal.2d 199, 206-207.) Trial courts must make reasonable efforts to accommodate defendant's choice of retained counsel. (*Courts*, at p. 790, quoting *Crovedi*, at p. 207.) Generally speaking, a defendant is entitled to a continuance to secure an attorney of his choice. (*People v. Haskett* (1982) 30 Cal.3d 841, 852 [trial court did not abuse its discretion by denying a continuance for trial preparation by defendant's newly retained attorney who substituted in for defendant's first retained attorney at the "eleventh hour"]; *People v. Reaves* (1974) 42 Cal.App.3d 852, 855-856.) Moreover, the right to counsel of one's choice is illusory unless counsel is given opportunity to prepare. (*Haskett*, at p. 852.)

14

However, the right to defend with retained counsel is not absolute; it must be weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case. (*United States v. Gonzalez-Lopez*, *supra*, 548 U.S. at p. 152; *Courts*, *supra*, 37 Cal.3d at pp. 790-791; *People v. Byoune* (1966) 65 Cal.2d 345, 346.) An unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay would violate the right to counsel. (*People v. Alexander*, *supra*, 49 Cal.4th at pp. 934-935.) However, the trial court may reject a continuance if the continuance would unreasonably disrupt the proceedings. (*People v. Haskett*, *supra*, 30 Cal.3d at p. 852; *People v. Bonville* (1968) 267 Cal.App.2d 4, 9 [defendant's right to obtain counsel of choice must be exercised reasonably].)

Additionally, a continuance may be denied if the defendant had a prior opportunity to find and prepare counsel but was unjustifiably dilatory in doing so. (*Ungar v. Sarafite* (1964) 376 U.S. 575, 590 [11 L.Ed.2d 921] [denial of continuance for new lawyer to prepare did not violate due process where defendant had sufficient time to obtain counsel and did not request continuance until the day of trial]; *Courts*, *supra*, 37 Cal.3d at pp. 790-791.) Although courts seek to accommodate substitution of counsel requests to the fullest extent consistent with effective judicial administration, a trial court retains discretion to deny requests made in an untimely manner that would result in an unreasonable delay in the processes of justice. (*Courts*, at pp. 790-791 [defendant was diligent in contacting attorney two months before trial and took reasonable and timely steps to obtain representation, and apprised court of efforts at earliest possible time]; *People v. Jeffers*, *supra*, 188 Cal.App.3d at pp. 849-850.)

Unlike in *People v. Haskett*, *supra*, 30 Cal.3d 841, and *People v. Jeffers*, *supra*, 188 Cal.App.3d 840, where the trial court's denial of a continuance for newly retained counsel who actually appeared and requested the continuance was not an abuse of

15

discretion, here defendant had not even started to look for counsel to retain. Defendant said, "*After talking to my sister right now*, I want *to try and hire* counsel…she wants to *try and hire* me an attorney." He also indicated they were "trying to get the rest of the money together." As the trial court observed, defendant clearly had plenty of opportunity to retain private counsel during those times he was released from custody on bail. The trial court further observed, there was no indication that defendant would be able to retain private counsel and, even if he could, substituting counsel at this late date would mean even more delay to allow retained counsel to prepare.

The record demonstrates that defendant was dilatory, indeed deliberately dilatory, as reflected in the trial court's comments that defendant was "malingering" during the evaluation process, and that defendant was disingenuous in claiming not to understand the court proceedings and then in the next breath reciting a litany of perceived deficiencies in appointed counsel's handling of the proceedings. We therefore reject defendant's argument that his cognitive deficiencies somehow impeded his ability to diligently seek retained counsel.

Additionally, the record shows that defendant engaged in many delay tactics throughout the pendency of the case, including: refusing to cooperate during the competency evaluation proceedings; failing to appear while on bail and fleeing the state, necessitating his extradition to get him back to court in California; feigning incompetency, apparently fooling some doctors but not those who were able to observe him over a period of time; entering a not guilty by reason of insanity plea, causing doctors to be appointed, and then withdrawing the plea; and while prospective jurors were about to be sent to the courtroom on the second day of trial, attempting to "fool" the trial court into thinking he was incompetent.

Lastly, granting defendant's belated request for a continuance would have unreasonably disrupted the trial. Seventy-five people from the community had been summoned, appeared for jury service, were assigned to the trial, and were being sent up

16

to the courtroom. The day before, a civilian witness who had previously failed to appear and for whom a warrant had been issued had been ordered to return on a specific date and time and cooperate with the prosecutor. The prosecutor was having problems coordinating law enforcement witnesses and predicted more of the same as the holidays approached. Continuing the case would have presented new challenges in coordinating the appearance of witnesses. The prosecutor apparently had the officers he needed at that point, was ready to proceed, and did proceed with the trial.

We conclude that the trial court did not abuse its discretion in denying a continuance.

## II. Restitution Fund Collection Fee

Defendant argues that because the trial court in its oral pronouncement of judgment merely imposed a $3,800 restitution fine and did not orally pronounce a 10-percent administrative fee to cover the cost of collecting the restitution fine, the court clerk lacked authority to add the fee in the minutes and the abstract of judgment, and we should reverse the fee. We conclude that the 10-percent fee specified under section 1202.4, subdivision (*l*), is mandatory and modify the judgment, as orally pronounced, to include the mandatory fee.

The oral pronouncement is the actual rendition of judgment, and the minutes and abstract cannot add anything substantive to the oral pronouncement. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Zackery* (2007) 147 Cal.App.4th 380, 387-388.) Where there is a discrepancy, the oral pronouncement controls. (*Zackery*, at p. 385.) The court clerk lacks the authority to add fines or fees not imposed by the trial court. (*Id*. at pp. 386-390.)

However, when a trial court fails to impose a statutorily mandated fine or fee, the sentence is unauthorized, and the appellate court may correct the error, even if the People failed to bring it to the trial court's attention. (*People v. Smith* (2001) 24 Cal.4th 849,

17

852-853; *People v. Scott* (1994) 9 Cal.4th 331, 354; *People v. Turner* (2002) 96 Cal.App.4th 1409, 1413; *People v. Terrell* (1999) 69 Cal.App.4th 1246, 1255-1256.)

Here, the trial court orally pronounced, "the Court will also impose an additional $3800 as a restitution fine, plus the same amount as a parole restitution fine which will be suspended subject to the successful completion of parole." The trial court did not orally pronounce imposition of the $380 collection fee. Nevertheless the court clerk apparently added the fee to the court minutes and abstract of judgment, but did not state the statutory basis for the fee. The court minutes state: "DEFENDANT TO PAY RESTITUTION FINE OF $3,800.00 PURSUANT TO PC 1202.4 COLLECTED BY CDCR. [¶] PLUS $380.00 ADMINISTRATIVE FEE FOR RESTITUTION FINE - RESTITUTION FUND COLLECTION FEE."[10] The abstract of judgment states, "Restitution Fine(s): $3,800.00 per PC 1202.4(b) forthwith per PC 2085.5" and "PLUS $380.00 SURCHARGE."

However, the People argue that the fee must have been imposed pursuant to section 1202.4, subdivision (*l*), which provides: "At its discretion, the board of supervisors of a county may impose a fee to cover the actual administrative cost of collecting the restitution fine, not to exceed 10 percent of the amount ordered to be paid, *to be added to the restitution fine and included in the order of the court*, the proceeds of which shall be deposited in the general fund of the county."[11] (Italics added.)

---

[10] Defendant has not asserted that that the section 1202.4, subdivision (*l*), fee is inapplicable to him because he has been sentenced to state prison and we take no position on that issue.

[11] We take judicial notice, as requested by the People, that the San Joaquin Board of Supervisors on September 12, 1995, adopted a "BOARD ORDER ESTABLISHING A TEN PERCENT FEE TO COVER THE ADMINISTRATIVE COST OF COLLECTING RESTITUTION FINES." The board order states: "This Board of Supervisors does hereby order and establish a fee effective September 18, 1995, to cover the administrative cost of collecting court ordered restitution fines equal to ten percent (10%) of the total amount ordered to be paid as authorized by Section 1202.4(l) of the Penal Code. This fee shall be paid to the county department administering the collection of court ordered

18

Defendant argues that the fee is not statutorily mandated, because section 1202.4, subdivision (*l*), gives the county board of supervisors *discretion* to impose the fee. Defendant further contends that statute itself contains no language requiring the court to impose the fee and regardless of "whether the county board of supervisors has exercised its discretion to" impose the fee, that action by the county board of supervisors does not render the trial court's failure to impose the fee an unauthorized sentence because "[c]ounty boards of supervisors do not define the jurisdiction of the trial courts; the Legislature does."

We conclude a fee under section 1202.4, subdivision (*l*), is mandatory, *not* because of the action by the county board of supervisors, but rather because of section 1202.4, subdivision (*l*), states that if a county board of supervisors takes action to establish the fee, the fee is "to be added to the restitution fine and included in the order of the court…." Thus, the Legislature has mandated that the court include the fee in the court order.

Accordingly, we modify the judgment, as orally pronounced, to include an administrative fee under section 1202.4, subdivision (*l*). While the abstract references a "$380 surcharge," it does not indicate the statutory basis for the fee. The abstract must be amended to set forth the statutory basis for the fee. (*People v. High* (2004) 119 Cal.App.4th 1192, 1200.)

restitution fines for deposit into the general fund of the county treasury for the use and benefit of the county."

## DISPOSITION

The judgment is modified to include a section 1202.4, subdivision (*l*), administrative fee, and the trial court is directed to prepare an amended abstract reflecting the statutory basis for the fee and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  The judgment as modified is affirmed.


    MURRAY    , J.


We concur:


    NICHOLSON    , Acting P. J.


    DUARTE    , J.