Filed 5/28/15  P. v. Grayson CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DWAYNE MARCUS GRAYSON, JR.,<br><br>    Defendant and Appellant. | A140008<br><br>(San Mateo County<br>Super. Ct. No. SC077317A) |

Dwayne Marcus Grayson, Jr., appeals from convictions of driving with wanton disregard for safety while attempting to evade the police, unlawfully taking a vehicle, resisting police officers, and driving with a suspended license.  He contends the trial court erred in denying his requests for a continuance to retain new counsel.  We affirm.

**STATEMENT OF THE CASE**

Appellant was charged by information filed on January 18, 2013, with felony driving with wanton disregard for safety while attempting to evade a pursuing police officer's vehicle (Veh. Code, § 2800.2), felony unlawful driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a)), misdemeanor resisting police officers (Pen. Code, § 148, subd. (a)(1)), and misdemeanor driving with a suspended license (Veh. Code, § 14601.1, subd. (a).  In connection with the felony offenses, it was alleged that appellant was ineligible for probation due to five prior felony convictions (Pen. Code, § 1203, subd. (e)(4)), had suffered a prior conviction for which he served a

1

separate prison term (Pen. Code, § 667.5, subd. (b)), and had suffered a prior "strike" adjudication (Pen. Code, § 1170.12, subd. (c)(1)).

On January 23, 2013, appellant pleaded not guilty to all counts, denied the special allegations, and waived time for trial. His motion for reduction of bail, previously set at $50,000, was denied. He subsequently posted bail. Jury trial was initially set for April 22, then reset for July 8, on a defense motion for a continuance.

Appellant was represented from the outset of the case by Private Defender Michael Hroziencik. On July 8, appellant appeared with defense counsel and stated his wish to make a *Marsden*[1] motion. After a hearing, the motion was denied by Judge Scott and the matter sent for trial assignment. Appearing before Judge Mallach, defense counsel told the court that the *Marsden* motion had been denied and appellant was requesting time to hire his own attorney. The prosecutor objected and the court, after questioning appellant, sent the case to Judge Foiles for trial assignment. Defense counsel again informed the court that appellant was requesting time to hire an attorney; Judge Foiles found the request tardy, ascertained that appellant had talked to but not yet hired an attorney, and sent the case for trial.

Jury trial began that afternoon before Judge Runde. Trial was bifurcated, and appellant waived jury trial on the alleged priors. The court struck the "strike" allegation.

On July 11, the jury found appellant guilty on all counts. The court found the probation ineligibility allegations true but found the prior prison term allegation not true. Appellant was sentenced on August 28 to the upper term of three years for the count of unlawful taking or driving of a vehicle, a concurrent middle term of two years for the count of evading a peace officer, and concurrent jail sentences of 169 days for each of the misdemeanor counts, with 169 days of credit for time served.

Appellant filed a timely notice of appeal on October 16, 2013.

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118.

**STATEMENT OF FACTS**

In the early morning hours of December 18, 2012, Franklin Litonjua's Honda Civic was stolen from a San Francisco street. He immediately reported the theft to the police.

Shortly before 7:00 p.m. on December 19, California Highway Patrol Officer Jeremy Maya was approaching the Monterey Boulevard exit on southbound Interstate 280 when he saw the stolen Honda in front of him, in a lane to his right, about 12 feet away. Maya saw two occupants in the Honda who appeared to be African-American males; he could see into the back seat and did not see any shapes resembling a person there, but he acknowledged he would not have been able to see if someone had been lying down below the rear passenger window. Maya positioned his car behind the Honda, confirmed through dispatch that it was a stolen vehicle, and requested assistance from other units. After confirming the vehicle was stolen, Maya specifically looked into the back seat to see if there were other people in the car because he was planning on pulling the car over; he saw no one in the back seat.

When Maya activated his overhead lights, the Honda slowed and Maya followed as it exited the freeway. The Honda then accelerated on the city streets, cutting through a gas station, crossing the double yellow lines and heading into oncoming traffic to avoid traffic stopped at a light, running the light at about 40 miles per hour in the 25-mile-per-hour zone, and then returning to the freeway, where it drove about 65 miles per hour on the right shoulder, and off again. Maya continued to follow as the Honda wove through traffic at about 60 miles in a 35-mile-per-hour zone, made abrupt U-turns, ran another red light, and drove onto the sidewalk to avoid traffic at a light; at this point, Maya was unable to keep up but saw a motorcycle officer and Daly City patrol cars take up the pursuit. When Maya first activated his lights to stop the Honda, a video recorder in his vehicle was automatically activated; he turned off the recorder when he discontinued the pursuit. The video recording was played for the jury.

3

Blake Lycett, a motorcycle officer, joined the chase as the Honda drove at 45 to 55 miles per hour in a 20- to 25-mile-per-hour business district, drove for a block on the wrong side of a divided highway and at over 55 miles per hour in a 35-mile-per-hour zone, then eventually turned into the dead-end Clark Street. Lycett did not lose sight of the car throughout the chase.

Lycett and Daly City Police Officer Donald McCarthy saw the Honda stop after turning into a driveway on the dead end. Both saw the driver's door and passenger side door open and two men run from the car; both described the driver as a "heavyset Black male" and the passenger as a "Hispanic male" of skinnier build. Neither saw more than two people leave the car and neither saw the rear doors of the car open. The two men ran up the driveway and then split in different directions. Lycett and McCarthy followed the driver. McCarthy saw him attempt to hide behind a hedge; Lycett lost sight of the man briefly, then saw him trying to hide behind bushes. The officers placed the man under arrest. Both identified appellant at trial as the driver.

Meanwhile, Maya found the Honda and police vehicles at the dead end. Lycett arrived and said someone had been detained, and CHP officers brought over a person Maya identified in court as appellant. Efforts to locate the passenger were unsuccessful.

According to his identification, appellant is six foot one inch tall and weighs 297 pounds. Maya testified that a person of this height would not be able to lie down flat on the back seat of the Honda Civic.

*Defense*

Appellant testified that on December 19, 2012, he paid his cousin to give him a ride to Office Max. His cousin was driving a black Honda Civic and a friend was in the front passenger seat. Appellant sat behind the driver's seat but, because the car was so small and he was "so big," he could not sit straight; instead, he sat with his back against the rear door and window of the car and his legs on the seat with his feet toward the passenger side. After stopping at Office Max, they got onto Interstate 280 southbound. Appellant's cousin did not get off the freeway at the exit appellant expected and did not

4

reply when appellant asked why, just kept looking in the rear view mirror; appellant looked back and saw the highway patrol behind them. Appellant's cousin told him not to worry about it and acted as though he was going to get off at the next exit, but did not.

The patrol car followed for a while before it turned on its lights and directed them to get off at the next exit. The passenger asked to be let out because he was on parole. Once off the freeway, appellant's cousin started to speed and appellant also asked to be let out of the car. His cousin did not respond. Appellant thought his cousin must "have something in his car that's making him drive like this." Because they were driving so fast, appellant braced himself with his feet against the rear passenger door and his hand on top of the driver's seat headrest, "scooting down" and "sitting low" "because if he hits something, I would be ejected, fall through the window." Appellant was "terrified" and asked his cousin "a thousand times" to pull over, and the passenger begged him to pull over, but the cousin kept driving. Appellant got out the rear door he had been leaning on, closing the door behind him, and ran because he was afraid there might be drugs or guns in the car for which he would be blamed. He had no idea the car was stolen because he always saw his cousin "in nice cars." The officers did not answer when appellant asked why he was being arrested. An officer asked who was driving the car and appellant made up a name, Willie B., rather than "snitching."

Appellant testified that he never would have gotten into the car if he knew it was stolen or knew his cousin would lead the police on a high speed chase. Appellant said he was "not trying to get in any trouble" because he had a daughter in college and a son, and had promised he was never going to jail again. Asked why Maya would not have seen him in the backseat before the chase began and appellant sank lower on the seat, appellant said that the officer was looking at the people in the front seat. Appellant believed the police officers were lying in saying they saw him get out of the driver's seat.

Appellant had been convicted for possession of drugs and a firearm in 2005, having pled guilty because "it was mine."

5

## DISCUSSION

On July 8, the date set for trial, appellant asked the court to grant a continuance to enable him to retain private counsel. He contends the trial court committed reversible error by denying this request without considering the relevant factors.

Appellant appeared on July 8 with appointed counsel, who stated that appellant wanted to make a *Marsden* motion. At a hearing before Judge Scott, appellant said he felt he was not being properly represented and his lawyer was not helping him. Apparently referring to a plea offer appointed counsel had recommended accepting, appellant said, "I didn't do anything but get a ride from somebody. I shouldn't get 16 months for getting a ride. [¶] There is nothing on my record. There is no *Pitchess*[2] on the cops. None of this is being done. That is all for a new lawyer if I have to even hire one." Appellant said he had never had a scheduled meeting with counsel, only court dates and "other than that, we never had any time to meet or any scheduled time for a meeting or anything."

Defense counsel told the court he had met with appellant at least four times at court appearances; that the initial issue was whether appellant had a strike, which it was finally determined he did not; and that at the last court appearance appellant said he did not want to take the 16 months because he was not driving the car. According to defense counsel, "I told him at that time, and also subsequently over the phone last week, that there were two police officers that said they saw him bail out of the car from the driver seat. He had indicated to me that he was in the back seat of the car. [¶] There was a video that I was provided with, and that I watched. There is no one in the back seat of the vehicle. There is only two people. Counsel said he had tried to explain to appellant that since he did not see on the video any indication there was anyone in the backseat, and the police officers were testifying that they saw appellant get out the driver's door, counsel expected a guilty verdict even if appellant testified contrary to the officers. In response to counsel's statement, appellant insisted he had told counsel before counsel saw the video

---

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

6

that he had been sitting behind the driver's seat sideways, with his feet across the back seat of the car because he was too big to fit sitting up, and that during the chase he "laid down a little bit." Appellant wanted another lawyer because appointed counsel was "not even with me," and had tried to convince him to "take time in the pen, and I didn't do anything."

The court asked about the *Pitchess* motion appellant had mentioned; counsel said he did not see a reason to bring the motion and appellant said he had told counsel the police officer was lying. Appellant explained he was "kind of upset" because he was not driving and had been to prison for things he had done but was "not trying to go to prison for something I didn't do." Appellant said he had asked why the car was not fingerprinted but the car had already been returned. When appellant returned to the subject of counsel not bringing the *Pitchess* motion he asked for, the court told him that tactics was not a sufficient basis for granting the motion. The court asked appointed counsel if he felt he could represent appellant, and counsel confirmed he could. Appellant asked, "I can't hire my own lawyer? I can hire an outside lawyer to come in and defend me." The court confirmed that this was a "Private Defender" case and was on "right now," then asked how long it had been pending and confirmed that the information had been filed on January 18.

The court found insufficient evidence to grant the *Marsden* motion, stating, "The case may proceed to trial. [¶] There has been nothing preventing you from hiring your own attorney, Mr. Grayson." Appellant asked again, "So, I can't hire my own lawyer?" The court replied, "I just said that there is nothing to prevent you from hiring your own lawyer. But today is the day set for trial. You will have to take that up with the trial judge."

Appearing before Judge Mallach, defense counsel reported that appellant's *Marsden* motion had been denied and he wanted to request time to hire his own counsel. The prosecutor objected, noting the case had been filed in December 2012. The court asked appellant if he had done anything to hire an attorney and appellant replied, "We

7

have been looking into one.  In fact I have his name, Damon Hale, Attorney at Law."  Judge Mallach noted she did not know this attorney and appellant said, "That's the lawyer I've been talking to about my case."  The court explained, "The problem, as [the prosecutor] points out, this matter has been set for trial on April 22nd.  Then it was set and it was continued looks like to today's date.  So it's kind of been a while."  Appellant said he had not been at the April 22 court date because he was at a funeral and "this is the next time," but the court noted he had been in court on June 11, "so you had some time."[3]  Appellant said he had not felt he needed a new lawyer at first because he thought defense counsel was doing things appellant had asked him to do, but counsel had not done them; the court noted that the *Marsden* issue had been resolved; and appellant stated, "I didn't want an appointed lawyer.  I want to hire my own lawyer.  I never wanted to go to the *Marsden* motion to have another appointed lawyer.  I wanted to hire my own lawyer from the gate."  When the court asked why he did not do so, appellant responded, "I just said I thought my lawyer was taking care of business I asked him to do for me."  The following colloquy ensued:

"The Court:  You said from the beginning you wanted to hire your own lawyer.  So why didn't you do that?

"[Appellant]:  I thought my lawyer was taking care of things for me that I had him take care of.  That is what made me want to hire my own lawyer.  At first I thought I was being represented right.  But I asked my lawyer here, Mr. Hroziencik, to do things he hadn't done.  This is why.

"The Court:   All right.  But, again, we get to square one which you are apparently not answering that is that you talked to a lawyer but what else have you done?

"[Appellant]:  I talked to him and let him know I will be hiring him.  [¶] . . . [¶] He told me to get the police report and everything from my lawyer right here.

---

[3] The court mistakenly stated, "you were here June 4th and then June 11th it looks like."  Appellant was not in court on June 4; this was actually the date of the funeral he mentioned.  He was present on June 11.

8

"The Court: Well, it doesn't work that way, Sir. You have to hire the person. That's the point I'm trying to make here. [¶] So okay. Well, I'm not seeing a lot of progress. So what I'm going to do right now is just send it to Judge Foiles at 2:00 p.m. this afternoon."

That afternoon defense counsel advised Judge Foiles that appellant wanted to ask for time for to hire his own attorney. Judge Foiles found the request tardy:

"The Court: This is the day of trial and that would be tardy. And I understand that was already addressed once by Judge Mallach. I also note your *Marsden* motion this morning, that was denied as I understand it. Today is the day for trial. [¶] And, Mr. Grayson, you have not yet retained a new attorney, have you?

"[Appellant]: No, I've talked to one.

"The Court: Okay. Talking versus retaining are different issues. So, at this point, that would be a tardy request."

Appellant now contends the trial court erred in failing to inquire into the factors relevant to his request to retain private counsel and denying the motion when a continuance would not have created unreasonable disruption. The error, he maintains, requires automatic reversal.

"The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing. [Citations.]' (*People v. Holland* (1978) 23 Cal.3d 77, 86.)" (*People v. Courts* (1985) 37 Cal.3d 784 (*Courts*).) Accordingly, "[a]ny limitations on the right to counsel of one's choosing are carefully circumscribed. Thus, the right 'can constitutionally be forced to yield *only* when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' (*People v. Crovedi* [(1966)] 65 Cal.2d [199,] 208 [(*Crovedi*)], italics added; *Maxwell v. Superior Court* [(1982)] 30 Cal.3d [606,] 613–614.) The right to such counsel 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts

9

of the particular case.' (*People v. Byoune* [(1966)] 65 Cal.2d [345,] 346.)" (*Courts*, at pp. 790-791.)

"Limitations on the right to continuances in this context are similarly circumscribed.  Generally, the granting of a continuance is within the discretion of the trial court.  (*Ungar v. Sarafite* (1964) 376 U.S. 575, 589; [*Crovedi,*] *supra,* 65 Cal.2d at pp. 206–207.)  A continuance may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.' (*People v. Byoune, supra,* 65 Cal.2d at pp. 346–347.)" (*Courts*, *supra*, 37 Cal.3d at pp. 790-791.)  "Where a continuance is requested on the day of trial, the lateness of the request may be a significant factor justifying denial absent compelling circumstances to the contrary.  ([*Courts*, at p. 792], fn. 4.)" (*People v. Jeffers* (1987) 188 Cal.App.3d 840, 850.)

"In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, ' "particularly in the reasons presented to the trial judge at the time the request [was] denied." ' ([*Crovedi*, *supra*, 65 Cal.2d] at p. 207, quoting *Ungar* v. *Sarafite, supra*, 376 U.S. at p. 589.)" (*Courts, supra,* 37 Cal.3d at p. 791.)  Appellant "has the burden to show 'an abuse of judicial discretion in the denial of his request for continuance to secure new counsel.' (*People v. Rhines* [(1982)] 131 Cal.App.3d [498,] 506.)" (*People v. Jeffers, supra,* 188 Cal.App.3d at p. 850.)  The erroneous deprivation of a defendant's counsel of his choice is a structural error requiring reversal, not subject to harmless error analysis. (*People v. Ortiz* (1990) 51 Cal.3d 975, 988; *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 149-150.)

In *Courts*, the defendant, represented by appointed counsel, had contacted a private attorney almost two months before the date set for trial, met with him several times about the case and attempted to raise funds for the retainer, but was unable to conclude the financial arrangements until the week before the date set for trial.  The court was informed of the defendant's wish to hire private counsel a week before trial but

10

denied a motion for a continuance as untimely; later that day, the attorney returned from vacation and agreed to represent the defendant if a continuance was granted. Efforts to place the matter on calendar for substitution of attorneys and a continuance were unsuccessful and on the day set for trial, when the matter was raised, the court again denied a continuance. (*Courts, supra,* 37 Cal.3d at pp. 787-789.) On appeal from his subsequent conviction, the California Supreme Court reversed, finding that the defendant had "engaged in a good faith, diligent effort to obtain the substitution of counsel *before* the scheduled trial date," "conscientiously informed the court of his efforts as early as [a week before trial] and made a motion for continuance on that date," and could not be faulted for not concluding financial arrangements sooner because the private attorney had been on vacation. (*Id.* at pp. 791-792.) By the time the motion was made on the day set for trial, an attorney-client relationship had been established, so that "the court was not confronted with the 'uncertainties and contingencies' of an accused who simply wanted a continuance to *obtain* private counsel. (*People v. Butcher* (1969) 275 Cal.App.2d 63, 69.)" (*Courts*, at p. 791.)

In the present case, by contrast, appellant did not raise the issue of retaining a private attorney until the day set for trial. Appellant told the court that he had not previously realized that his attorney was not doing the things he wanted done, but the record demonstrates that the primary reason for his dissatisfaction with appointed counsel was evident a month before the trial date: Counsel told the court that at the court appearance on June 11, appellant said he did not want to accept the plea deal because he was not driving the car and counsel explained the reasons he thought appellant would be convicted if he went to trial. Moreover, unlike the defendant in *Courts,* who had been attempting to make the financial arrangements to hire private counsel for two months before trial and by the day of trial had paid a retainer and established an attorney-client relationship, appellant had not hired an attorney, only spoken with one, and offered no response to the court's questions why he had not acted sooner.

11

Nor is this case like *People v. Lara* (2001) 86 Cal.App.4th 139 (*Lara*), in which a motion to discharge retained counsel on the day set for trial was found timely. In that case, the attorney had not consulted with the defendant throughout the nearly one and a half years the case had been continued. The defendant was "unaware of the nature of [the attorney's] preparation until the moment the trial was finally set to begin," at which point he learned that the attorney had not yet interviewed the prosecution witnesses, and the defendant and attorney had a major disagreement about whether to call an accomplice as a witness for the defense. The *Lara* court found that "[u]nder the circumstances, [the defendant] informed the court of his concerns at the first possible opportunity." (*Id.* at pp. 162-163.)

Appellant relies upon *Lara, supra,* 86 Cal.App.4th at page 163, and *People v. Hill* (1983) 148 Cal.App.3d 744, 755, 761 (*Hill*), another case concerning discharge of retained counsel, to argue that a court's failure to inquire adequately into a defendant's complaints about counsel results in a record that does not permit appellate review. In *Lara,* the court failed to inquire into factors bearing on the discharge of retained counsel, mistakenly conducting a *Marsden* inquiry instead. In *Hill,* the court refused to substitute counsel after ex parte discussions with counsel, without giving the defendant any opportunity to voice his complaints or respond to counsel's statements, and even the court's discussions with counsel were not part of the record. (*Hill*, at p. 755.)

Here, the record does not support appellant's assertion that the trial court conducted no inquiry into the circumstances of his motion for a continuance to hire private counsel. Appellant states that when the case first came before Judge Mallach, as master calendar judge, counsel informed the court that appellant "was seeking to change counsel" and the request "was treated as a *Marsden* motion and was referred to Judge Scott for a hearing (referred to throughout as the *Marsden* hearing, although that is not what Grayson intended.)" The record does not contain a reporter's transcript for the proceedings before Judge Mallach ahead of the *Marsden* hearing. Before Judge Scott, however, when the court asked, "I understand Mr. Grayson that you wish to make a

12

*Marsden* motion," appellant replied, "Yes." Neither appellant (who, of course, may not have fully understood the significance of the reference to *Marsden*) nor appointed counsel indicated appellant was seeking to retain counsel rather than have a different attorney appointed. Appellant's first reference to hiring an attorney suggested this was a back-up position: After describing the things he felt counsel had not done for him, appellant said, "That is all for a new lawyer if I have to *even* hire one." (Italics added.) It was only after the court asked appointed counsel if he felt he could continue to effectively represent appellant that appellant said, "I can't hire my own lawyer? I can hire an outside lawyer to come in and defend me." While appellant faults Judge Scott for not inquiring further at this point, the case had been referred to Judge Scott for the specific purpose of conducting a *Marsden* hearing. Having concluded substitution under *Marsden* was not warranted, and it being the date set for trial, it was not inappropriate for Judge Scott to direct appellant to raise the issue of retained counsel with the trial judge.

Defense counsel immediately raised the issue on appellant's behalf when they returned to Judge Mallach's courtroom. Contrary to appellant's assertion that the prosecutor never objected to his motion, the prosecutor *did* object, noting that the case had been filed in December 2012, and the court explained to appellant that this was a problem. The court asked appellant if he had done anything to hire an attorney and appellant said he had been "looking into one" and gave the name of the lawyer he had been "talking to about my case." Appellant indicated he had initially thought counsel was doing the things he wanted done, and, reminded of the denial of the *Marsden* motion, said he had never wanted a different appointed counsel but "wanted to hire my own lawyer from the gate." As described above, the court then questioned appellant why, if he had wanted to hire an attorney, he had not done so rather than only talk to one

Appellant's briefs ignore this exchange with Judge Mallach. Judge Mallach *did* inquire into appellant's wish to retain counsel, and learned that despite his dissatisfaction with appointed counsel, appellant had spoken with but not hired a new attorney. Although appellant said he initially thought appointed counsel was representing him as he

13

wanted, as discussed above, it is clear his dissatisfaction did not arise suddenly on the first day of trial.

"Where a continuance is requested on the day of trial, the lateness of the request may be a significant factor justifying denial absent compelling circumstances to the contrary. ([*Courts*]*, supra,* 37 Cal.3d at p. 792, fn. 4.)" (*People v. Jeffers, supra,* 188 Cal.App.3d at p. 850.) As this court observed in *People v. Turner* (1992) 7 Cal.App.4th 913, 919 (*Turner*), where the defendant sought to replace his attorney on the day of trial: "This meant that the request could not be granted without causing a significant disruption, i.e., a continuance with the attendant further inconvenience to witnesses and other participants. (*Id.* at p. 919, fn. omitted.) The question then became whether such a disruption was reasonable under the circumstances."

Appellant also relies upon *Lara, supra,* 86 Cal.App.4th at pages 163-164, and *Hill, supra,* 148 Cal.App.3d at page 761, for the proposition that in the absence of evidence of unreasonable disruption in a particular case, reviewing courts will presume no such disruption would result. In *Hill*, a number of errors were found to violate the defendant's rights: First, when the defendant expressed dissatisfaction with his appointed counsel, the court violated *Marsden* by discussing the matter with counsel but not the defendant; next, the court erred in granting the defendant's *Faretta*[4] motion to represent himself, as the defendant's waiver was induced by the erroneous denial of the motion to substitute counsel, and in denying a continuance; after the defendant withdrew his *Faretta* motion and the court reappointed an attorney who had earlier represented him without allowing the defendant to voice any objections, when the defendant renewed his *Faretta* motion, the court erroneously granted it although the sole factor supporting this decision was the defendant's willingness to proceed without a continuance and all the other relevant factors indicated the motion should be denied; and when the defendant subsequently sought to reinstate counsel, the court erroneously denied the motion because counsel was not willing to proceed without a continuance. (*Hill*, at pp. 751-752, 755-757, 759-761.)

_____

[4] *Faretta v. California* (1975) 422 U.S. 806.

With regard to the last of these points, the reinstatement of counsel, the *Hill* court stated that because " 'no showing was made by the prosecution that the requested continuances would cause a disruption in the calendar of the courts, that it would be detrimental to the prosecution of the cases, or that it would be contrary to the interests of justice . . . it must be presumed that the continuance requested by defendant in the instant case would not have caused disruption to the court or prejudice to the prosecution beyond that normally involved in a three-week delay.' " (*Hill*, *supra*, 148 Cal.App.4th at p. 761, quoting *People v. Cruz* (1978) 83 Cal.App.3d 308, 321 (*Cruz*).)[5] The court did not

---

[5] It was *Cruz* that involved a three-week continuance; the trial court in *Hill* did not ask how long a continuance the attorney would require before denying the motion to reinstate counsel. In *Cruz*, the source of the presumption language appellant relies upon in *Hill*, the defendant early in the proceedings said he wanted to proceed in propria persona because he had a conflict with the public defender's office based on past cases and had been told not to look to the office for further assistance. (*Cruz, supra,* 83 Cal.App.3d at pp. 316-317.) Without inquiring further or questioning the public defender, the court tested the defendant's competency and warned him about self-representation. (*Id.* at p. 318.) On the date set for trial, the defendant sought to withdraw his waiver of counsel and have the public defender reinstated; the attorney *Cruz* held that the trial court erred in failing to make the appropriate inquiries regarding substitution of counsel and, as a result, the initial waiver of counsel was ineffective because it was based solely on the perceived lack of alternatives. (*Id.* at pp. 317-318.) On the date set for trial, when the court denied a request for a two to three week continuance, the defendant sought to withdraw his waiver of counsel and have the public defender reappointed. (*Id.* at p. 319.) The court denied this request because the public defender represented a continuance of more than three weeks would be necessary. (*Ibid.*)

*Cruz* considered a number of criteria suggested in *People v. Elliot* (1977) 70 Cal.App.3d 984, 993-994, to guide review of a trial court's denial of a motion to withdraw a waiver of counsel, including the reasons for the request, the length and stage of the proceedings, the disruption or delay expected from granting the motion, and the likelihood of defendant being able to effectively defend against the charges. (*Cruz, supra,* 83 Cal.App.3d at pp. 319-320.) Because the other factors supported granting the motion and there was no showing of likely disruption "beyond that normally involved in a three-week delay," denial of the motion to reinstate counsel was an abuse of discretion. (*Id.* at pp. 320-322.)

In *People v. Elliot, supra,* 70 Cal.App.3d 984, the defendant's initial waiver of counsel was valid but the trial court erred in denying his subsequent request to withdraw

presume *no* disruption to the court process; it simply presumed no more than would normally be involved with a delay of the length at issue. In light of the clear violations of the defendant's rights, this degree of disruption was insufficient to support denial of the request to reinstate counsel and force the defendant to defend himself at trial.

Lara declined to presume that a motion to discharge retained counsel on the first day of trial was *necessarily* untimely and would result in disruption of the orderly process of justice or prejudice to the prosecution. (*Lara, supra,* 86 Cal.App.4th at pp. 162-164.) Since the trial court had erroneously conducted only a *Marsden* inquiry and had not examined factors relevant to discharge of retained counsel, there were no factual findings on timeliness or disruption of the court's processes. (*Lara*, at p. 163.) The *Lara* court noted that the record suggested the prosecution witnesses might have been inconvenienced if they were en route from out of town at the time the defendant raised his motion but stated that "this aspect of the timeliness issue must remain as mere speculation given the trial court's mishandling of this issue." (*Ibid.*) The defendant in *Lara,* as we have said, raised his complaints about retained counsel at the first opportunity, when counsel who had not consulted with him for the entire year and a half the case had been pending appeared to be unprepared on the first day of trial. (*Id.* at pp. 146-147, 162-163.) Moreover, the prosecutor raised no objection to the request to discharge counsel and the trial court, although mistakenly viewing it as a *Marsden* motion, did not suggest it was untimely. (*Lara*, at pp. 155, 163.)

In both of these cases, the trial courts' mishandling of the defendants' motions resulted in records that did not permit review of the relevant factors. In the absence of evidence showing particular inconvenience or disruption to orderly court processes, the reviewing court in *Hill* presumed there would be no more than the ordinary degree of inconvenience or disruption expected from a continuance; the reviewing court in *Lara* declined to presume granting the motion would *necessarily* prejudice the prosecution or

the waiver. (*Id.* at pp. 990-991.) As in *Cruz,* there was no showing of likely disruption and the other relevant factors supported granting the request. (*Elliot*, at pp. 994-998.)

16

disrupt orderly judicial processes. These decisions do not stand for the proposition that, absent a showing of inconvenience or disruption specific to the case, a motion for a continuance to retain counsel who has not yet been retained, unjustifiably brought on the day set for trial, cannot be denied on the basis of untimeliness.

As indicated above, untimeliness is a significant factor that may justify denial of a motion for a continuance to retain counsel. In *Turner*, *supra,* 7 Cal.App.4th 913, the defendant expressed dissatisfaction with his attorney when the case was called for trial. The defendant had wanted his attorney to bring a *Pitchess* motion and a motion to disqualify the judge; the attorney had declined, explaining that the *Pitchess* motion would not lead to disclosure of relevant or admissible evidence and there were not sufficient grounds for a disqualification motion. (*Turner*, at pp. 915-916.) The trial court denied the motion, noting that it appeared its purpose was to delay the hearing because all the witnesses were present. (*Id.* at p. 916.) *Turner* upheld this decision that there was "no adequate basis for permitting the disruption of a continuance." (*Id.* at p. 919.)

In *People v. Lau* (1986) 177 Cal.App.3d 473, after the case was called for trial and counsel for his codefendant had announced he was ready, the defendant sought to discharge retained counsel because his attorney wanted him to plead guilty when he did not feel he was guilty, and he did not think the attorney would fully represent him at trial. (*Id.* at p. 477.) The trial court explained that counsel would not have been doing his job if he had not informed the defendant of his evaluation of the likelihood of prevailing at trial, and counsel assured the court he would defendant his client as best he could. (*Ibid.*) The trial court denied the motion, commenting that the main problem was the defendant's disagreement with counsel's analysis and evaluation of the case against him, and this did not justify a substitution of attorneys at such a late date in a two-defendant case. (*Id.* at p. 479.) Noting that the trial court had not relied solely on the untimeliness of the motion but considered the defendant's reasons, the *Lau* court upheld this decision, found no error in denial of the motion, "especially given its untimeliness." (*Ibid.*)

We find no abuse of discretion.

17

## DISPOSITION

The judgment is affirmed.

_____

Kline, P.J.


We concur:


_____

Richman, J.


_____

Miller, J.